Richard LESSNER, Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF COMMERCE; James K. Pont, Deputy Director, Office of Export Admin., United States Department of Commerce; Douglas A. Riggs, General Counsel, United States Department of Commerce, Defendants-Appellees.

No. 86–2411.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1987.

Decided Sept. 14, 1987.

As Amended Oct. 13, 1987.

Terrance C. Mead, Phoenix, Ariz., for plaintiff-appellant.

Dept. of Justice, John F. Daly, Washington, D.C., for defendants-appellees.

Before FLETCHER, BEEZER and THOMPSON, Circuit Judges.

PER CURIAM:

Richard Lessner challenges the Department of Commerce's refusal to supply him, upon his Freedom of Information Act (FOIA) request, with the names of businesses and individuals granted licenses to export to the Soviet Union. We agree with the district court that the information he seeks is exempt from disclosure under 5 U.S.C. § 552b(b)(3).

### FACTS

On March 5, 1985, Lessner requested, pursuant to FOIA, a list of "United States companies, corporations and individuals holding export licenses to the Soviet Union." An export license identifies the licensee, purchaser, consignee, intermediate consignee, country of ultimate destination and unit price and quantity of the commodity. An application for an export license contains additional information, including the names of all parties for whom the applicant may be acting as agent, information regarding foreign availability, other parties in interest, action taken by the Department of Commerce, and the name of

the person acting for the applicant, Lessner explicitly disclaimed any intention of requesting Shippers' Export Declarations.[1]

The Deputy Director of the Office of Export Administration denied the request. He concluded that the information was exempt from disclosure under Exemption (3)(B), finding that section 12(c)(1) of the Export Administration Act (EAA), 50 U.S.C. App. § 2411(c)(1), expressly delineated material to be withheld and that this material was within the scope of section 12(c)(1). Lessner's appeal was denied by the General Counsel. In addition to concluding that Exemption (3)(B) barred disclosure, the General Counsel noted that the Under Secretary for International Trade had determined that disclosure of the identities of license holders would not be in the public interest. The General Counsel stated that the Department obtained such information under assurances of confidentiality and the identification of license holders, together with other available information, could reveal competitively significant information regarding the holders' businesses. The General Counsel's letter constitutes the final decision of the Department of Commerce.

Lessner brought suit in federal court. Upon the government's summary judgment motion and Lessner's cross-motion for summary judgment, the district court entered judgment in favor of the government on the ground that the requested information was properly withheld under Exemption (3)(B).[2] Lessner timely appeals. We affirm.

### DISCUSSION

*Standard of Review*

The court's task in this case is to review the district court's statutory interpretation, a question of law that ordinarily is reviewed *de novo*. *Julian v. United States Department of Justice*, 806 F.2d 1411, 1415–16 (9th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 3209, 96 L.Ed.2d 695 (1987).[3]

---

1. *See* footnote 8 for description of Shippers' Export Declarations.

2. The district court did not reach the issue of whether disclosure was barred under Exemption 4.

3. Some FOIA determinations are essentially fac-

The government, however, would have us defer to agencies' interpretations of statutes delegating authority to the agencies, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), and suggests that this court, as well as the district court, should defer specifically to the Department of Commerce's interpretation of Exemption 3. *See Church of Scientology,* 792 F.2d 153, 167–70 (D.C.Cir.1986) (en banc) (Silberman, J., concurring), *cert. granted,* —— U.S. ——, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987). Judge Silberman's concurrence expressly disavows the D.C. Circuit's approach in *Sims v. CIA,* 642 F.2d 562, 568 (D.C.Cir. 1980). A basic policy of FOIA is to ensure that Congress and not administrative agencies determines what information is confidential. Given the court's responsibility to ensure that agencies do not interpret the exemptions too broadly, *id.,* deference appears inappropriate in the FOIA context. However, because our conclusion is the same under either approach, we need not resolve the standard of review issue here.

*I. Section 12(c)(1) as an Exemption 3 Statute*

Lessner contends that section 12(c)(1)[4] of the EAA does not qualify as an Exemption 3 statute. This argument lacks merit.

The thrust of FOIA is "to provide for open disclosure of public information." *Baldrige v. Shapiro,* 455 U.S. 345, 352, 102 S.Ct. 1103, 1108, 71 L.Ed.2d 199 (1982).

Information may be withheld from public disclosure only if it falls within one or more of nine exemptions. 5 U.S.C. § 552(b), (c). In light of the policy of open disclosure, exemptions are construed narrowly, *Julian,* 806 F.2d at 1416; *Lee Pharmaceuticals v. Kreps,* 577 F.2d 610, 614 (9th Cir.1978), *cert. denied,* 439 U.S. 1073, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979), and the government bears the burden of justifying its refusal to disclose information. *Julian,* 806 F.2d at 1416.

Under Exemption 3(B), an agency may refuse to disclose information that is likely to reveal matters specifically exempted by a statute that "refers to particular types of matters to be withheld."[5] Whether information is exempt from disclosure is a Congressional determination, not an administrative one. *Irons & Sears v. Dann,* 606 F.2d 1215, 1220 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1075, 100 S.Ct. 1021, 62 L.Ed.2d 757 (1980). Therefore, in determining whether material is exempt under subsection 3(B), "a court must consider the underlying congressional intent to exempt material from the FOIA." *Church of Scientology v. United States Postal Service,* 633 F.2d 1327, 1330 (9th Cir.1980). A court must then determine, under subsection (B), whether Congress has "articulated 'particular criteria'" to guide the agency charged with administering the law. *Id.* If only "very general benchmarks for secrecy" are set forth, the agency is delegated too much discretion and the criteria of subsection (B) are not met. *Id.*

tual and are reviewed for clear error. *Lewis v. Internal Revenue Service,* 823 F.2d 375, 378–79 (9th Cir.1987).

**4.** Section 12(c)(1) of the EAA, 50 U.S.C.App. § 2411(c)(1) provides in pertinent part:
[I]nformation obtained under this Act on or before June 30, 1980, which is deemed confidential, including Shippers' Export Declarations, or with reference to which a request for confidential treatment is made by the person furnishing such information, shall be exempt from disclosure under section 552 of title 5, United States Code, and such information shall not be published or disclosed unless the Secretary determines that the withholding thereof is contrary to the national interest. Information obtained under this Act after June 30, 1980, may be withheld only to the extent permitted by statute, except that infor-

mation obtained for the purpose of consideration of, or concerning, license applications under this Act shall be withheld from public disclosure unless the release of such information is determined by the Secretary to be in the national interest.
The information was requested after June 30, 1980.

**5.** More fully, 5 U.S.C. § 552b(b)(3) states that an agency may refuse disclosure of information that is likely to disclose matters "specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."

■ The legislative history strongly suggests that Congress intended section 12(c)(1) to be an Exemption 3 statute. The House Committee on Foreign Affairs expressed its "intent ... to meet the requirements of the Freedom of Information Act by specifying the particular types of matters which may be withheld from disclosure." H.R.Rep. No. 96–200, 96th Cong., 1st Sess. 28 (1979). It noted that one of the two principal problems to be addressed by Congress was that the EAA provisions, as they stood, might not satisfy Exemption 3. *Id.* at 10–11. The Senate Committee on Banking, Housing, and Urban Affairs stated that it believed that a FOIA exemption for EAA materials "already exist[ed] as a matter of law" and sought to "restate[ ] the intention of the Congress" to protect information submitted by private parties under the EAA. S.Rep. No. 96–169, 96th Cong., 1st Sess. 17, *reprinted in* 1979 U.S. Code Cong. & Ad.News 1147, 1164. Although Congress altered what information was subject to disclosure, it did not change its underlying intent to insure that the EAA confidentiality provision conformed with the requirements of Exemption 3. Further, Congress expressly referred to a similar statute as a withholding statute for the purposes of Exemption 3. S.Rep. No. 96–796, 96th Cong., 2d Sess. 4 (1980), U.S. Code Cong. & Admin.News 1980, p. 1589; 13 U.S.C. § 301(g) (exempting Shippers' Export Declarations from disclosure "unless the Secretary determines that such exemption would be contrary to the national interest").

Lessner maintains, however, that section 12(c)(1) does not constitute an Exemption 3(B) provision because its terms provide excessive discretion to the agency. In particular, he challenges both the "national interest" criterion and the "concerning" language as too imprecise to lodge disclosure decision-making authority in Congress rather than in the agency.

Unlike subsection (A), subsection (B) does not expressly require a statute to limit the amount of discretion an agency may exercise to maintain the statute's exemption status. The two subsections are phrased in the disjunctive and generally interpreted as separate criteria. *See Irons & Sears,* 606 F.2d at 1220. However, in *Church of Scientology,* we held that because Congress determines what information is exempt, the amount of discretion an agency may exercise under the statute is relevant to subsection (B) as well as subsection (A). *Church of Scientology v. United States Postal Service,* 633 F.2d 1327, 1330 (9th Cir.1980). More discretion, however, is permitted under subsection (B), than under subsection (A). Lessner's interpretation of *Church of Scientology* would blur the distinction between subsections (A) and (B). Under subsection (B), a statute providing for limited unguided discretion may qualify as an Exemption 3 statute where the legislative history supports the view that Congress intended it to be such a statute and where the identified class of nondisclosable matters is narrow. *Church of Scientology,* 633 F.2d at 1331.

Section 12(c)(1) of the EAA provides for only limited discretion. It establishes a presumption that information will be withheld unless discretion is exercised. *See Lee Pharmaceuticals,* 577 F.2d at 615–17 (exemption 3 status conferred upon statute providing that "[a]pplications for patents shall be kept in confidence ... unless necessary to carry out the provisions of any Act of Congress or in such special circumstances as may be determined by the Commissioner"); *see also Irons & Sears,* 606 F.2d at 1220–21. Further, the agency's discretion to disclose may be exercised only in furtherance of the national interest, *see Lee Pharmaceuticals,* 577 F.2d at 616 (disclosure in "special circumstances"), which is determined in part by reference to congressional findings and declarations of policy.

Nor does the word, "concerning," provide the Secretary with too much discretion. This court has held that section 6103 of the Internal Revenue Code of 1954, 26 U.S.C. § 6103, qualifies as an Exemption 3 statute. *Willamette Industries, Inc. v. United States,* 689 F.2d 865, 867 (9th Cir. 1982), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1500, 75 L.Ed.2d 931 (1983). Under section 6103, confidentiality is afforded returns and return information. Return information includes, not only identity and nature of income, but also "any other data, re-

ceived by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return...." *Chamberlain v. Kurtz,* 589 F.2d 827, 836 n. 25 (5th Cir.) (quoting in part 26 U.S.C. § 6103(b)(2)(A)), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). *See also Medina-Hincapie v. Department of State,* 700 F.2d 737, 742–43 (D.C.Cir.1983) (affording Exemption 3 status to statute requiring Secretary to withhold records "pertaining to the issuance or refusal of visas or permits to enter the United States"); *Irons & Sears,* 606 F.2d at 1220 (section 122 satisfies Exemption 3(B) because it refers to "patent applications and information concerning them"); *contrast Church of Scientology,* 633 F.2d at 1333 (noting that Congress determined that the term, "investigatory files," allows excessive discretion).

Lessner asserts further that the EAA provision does not establish a narrowly drawn class of information that is withheld under FOIA, but rather prohibits disclosure of essentially all information collected under the EAA. But the EAA provides for the maintenance of data other than information about export license holders. For example, United States firms that enter into certain commercial agreements with agencies of foreign governments must report these agreements. 50 U.S.C.App. § 2404(j). Businesses and individuals must report requests they have received to take action in furtherance of international boycotts. 50 U.S.C.App. § 2407(b)(2). Private parties may submit information regarding reports by technical advisory committees, 50 U.S.C.App. § 2404(h), petitions for short supply controls, 50 U.S.C.App. § 2406(c), and petitions for relief from export controls, 50 U.S.C.App. § 2408(a). *See also American Jewish Congress v. Kreps,* 574 F.2d 624, 631 & n. 54 (D.C.Cir.1978) (listing data collecting provisions in pre–1979 EAA).

We conclude that section 12(c)(1) of the EAA qualifies as an Exemption 3(B) statute. Congress expressed its intent to pass an Exemption 3 statute, the statute permits the exercise of only limited discretion by the Department of Commerce, and it authorizes withholding a narrowly drawn class of materials from disclosure.

*II. Scope of Section 12(c)(1)*

 The government may refuse to disclose the names of exporters granted licenses if such information is "information obtained for the purpose of consideration of, or concerning, license applications under this Act." 50 U.S.C.App. 2411(c)(1).

In interpreting the scope of the provision, we look first at the language of the statute. *See Landreth Timber Company v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985). Names of applicants certainly would be "information ... concerning applications" and therefore information that may be withheld under section 12(c)(1). Names of applicants whose applications were granted constitute merely a subset of all names of applicants, and therefore would also appear to be properly withheld. Nonetheless, Lessner asserts that Congress did not intend to prohibit disclosure of information pertaining to licenses. We therefore address the legislative history of section 12(c)(1). *See United States v. American Trucking Associations,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940).

Section 12(c)(1) underwent several revisions before its final form was set.[6] The Senate committee bill, S. 737, would have exempted "information required to be furnished pursuant to the [EAA], other than boycott-related information, from the disclosure requirements of the Freedom of Information Act," except as otherwise provided by statute and except where "the Secretary of Commerce determines that to

---

6. To ease confusion, a skeletal description of the legislative history follows: S. 737, which was substantially similar to H.R. 4034, was changed by an amendment introduced by Sen. Hatch. This was the version ultimately enacted. Another Senate bill, S. 977, introduced by Sen. Proxmire and reflecting the administration's position

of complete confidentiality, never reemerged from committee. The House Committee bill, H.R. 4034, was amended by the Preyer amendment. Amendments to the House bill calling for substantially less confidentiality, submitted by Reps. Dornan and Quayle, were rejected.

withhold such information is contrary to the national interest." S.Rep. No. 96–169, 96th Cong., 1st Sess. 17, *reprinted in* 1979 U.S.Code Cong. & Ad.News 1147, 1164. The committee expressly stated that to disclose such information as the precise value, nature, *parties* to the transaction and shipping date where the sole reason that information is provided to the government is to obtain an export license is not in the public interest. *Id.*[7]

On the Senate floor, Sen. Hatch introduced an amendment, which contained language virtually the same as the provision enacted. He stated that after 1980, "all export control information [would be] subject to the Freedom of Information Act except for license applications. These license applications are the items that exporters are most concerned about becoming available to their competitors, plus they contain sensitive national security information." 125 Cong.Rec. 20013. The Senate adopted the amendment without debate. *Id.*

The classification we attach to "licenses" determines whether the information must be disclosed—information on license applications is exempt; "export control information" is not. The meaning of the term, "export control information," is unclear. One clue may be culled from Sen. Hatch's statement that the issue of access to export control information would be considered the following year. *Id.* In 1980, Congress considered whether Shippers' Export Declarations (SEDs) should be kept confidential.[8] The government argues that data other than that collected for licensing is collected under other EAA provisions, and that it is this other data to which Sen. Hatch must have referred. As noted above, the EAA does have other data-collecting provisions.

Similar to the Senate committee bill, the House committee bill, H.R. 4034, would have barred the disclosure of information which "would reveal the *parties* to an export or re-export transaction, the type of good or technology being exported or reexported, or the destination, end use, quantity, value, or price of such good or technology." H.R.Rep. No. 96–200 at 62–63 (emphasis added). A daily list of summary information, including type of commodity, value of the transaction, and country of destination when export licenses have been granted could continue to be published. 125 Cong.Rec. 25639. The bill purported to have rejected the broad confidentiality provisions suggested by the White House, although as Rep. Dornan pointed out, it is unclear what could have been released under the committee bill. 125 Cong.Rec. 25641.

On the House floor, Rep. Dornan suggested amending the House committee bill to make nearly all EAA data disclosable. It is unclear, however, whether the names of parties to export transactions would have been revealed. Rep. Quayle changed the Dornan amendment by imposing a bar to disclosure for six months following the issuing of a license. After the six months, under his suggestion for disclosure, the countries of the parties, the type of goods or technology, the destination, the end use, and the quantity would be revealed, but the identities of the parties, the value and the price would remain confidential. 125 Cong. Rec. 25640; 125 Cong.Rec. 25642. He stated that "We are not after licensing information, we are not after information during the process, we are concerned and interested about historical data." 125 Cong. Rec. 25642. Significantly, under this proposal, which requires more disclosure than the statute enacted, the names of parties to

---

**7.** Senator Proxmire introduced a bill further restricting confidentiality that incorporated the Administration's recommendation. S. 977. This bill was rejected in committee.

**8.** Shippers' Export Declarations are filed pursuant to 13 U.S.C. § 301 for each export transaction and are used to compile statistical information. They contain such information as the shipper's name, the general character of the commodity, destination, quantity and value.

In 1979, when Congress was considering the section in issue, SEDs were to be withheld from disclosure through June, 1980. Prior to this date, Congress provided for their continued withholding. *See* 13 U.S.C. § 301(g).

Licensing appears to have been juxtaposed against SED by Rep. Preyer on the House floor as well. *See* footnote 9.

export transactions could be withheld. Rep. Dornan accepted the proposal, but it was ultimately defeated in favor of the Preyer amendment.

In arguing for more confidentiality than that provided for by the Quayle amendment, Rep. Preyer suggested prohibiting the disclosure of all "information concerning *licensing* of exports." 125 Cong.Rec. 25635 (emphasis added). Seemingly using the terms "licenses" and "licensing applications" interchangeably, he stated that he had the same intent as the House Committee with regard to export license information, *id.*, and that "[w]here export licenses are required, [his] amendment [would] allow[] for full protection of confidential information related to the license application." *Id.* Rep. Preyer's proposal for disclosure of other export information, except that otherwise barred by other FOIA exemptions, seems to have been directed primarily at Shippers' Export Declarations.[9] Rep. Preyer's amendment was adopted by the House.

At conference, the committee adopted the Senate bill as amended by the Hatch proposal. The conference report does not explain why it selected Sen. Hatch's language referring to license application information rather than Rep. Preyer's amendment concerning licensing information. H.Conf.Rep. No. 96–482, 96th Cong., 1st Sess., *reprinted in* 1979 U.S.Code Cong. & Ad.News 1147, 1180, 1194. In reporting to the House, a conference committee member simply stated that "[t]he Preyer amendment on confidentiality was re-

tained." 125 Cong.Rec. 26811. In sum, the legislative history suggests that Congress intended information other than that contained in licenses, including information from SEDs, to be disclosed, and that licenses were classified with license applications, which are withheld from disclosure.

The legislative purpose of section 12(c)(1) reinforces our view. The government argues that in passing section 12(c)(1), Congress intended to protect exporters from "harassment" by members of the public who do not approve of the exporters' goods or buyers. Although several Members of Congress did refer to harassment, *see, e.g.,* 125 Cong.Rec. 25639; 125 Cong.Rec. 25642, the context and brevity of these statements render their meaning elusive. More likely, as the government also suggests, Congress intended to protect exporters from the disclosure of information that a competitor would use to the exporters' disadvantage. *See, e.g.,* 125 Cong. Rec. 8261 (discussing stricter White House version of confidentiality provision). The identity of an exporter, when combined with other information that is publicly released, such as a general description of the commodity or its value, "would convey vital information about a company's trade and commercial position." *Id.* The release of this information could damage exporters, and, in turn, the country's balance of trade. Although export information, including identity, could be protected under Exemption 4, which prohibits disclosure of trade or commercial secrets, Congress endeavored to avoid judicial piecemeal determinations,

---

9. Rep. Preyer stated:

"As reported [the House Committee bill's] section 114 would totally and permanently exempt from disclosure a broad category of information relating to exports. Chiefly at issue here is the information reported on the Commerce Department document known as the Shipper's Export Declaration" or SED. An SED must be filed for each export from this country. Under the bill, none of the data on an SED would ever be made public. This blanket exemption is unnecessary and unwise...."

125 Cong. Rec. 25635. Rep. Preyer noted that greater access to "export information," which seems to mean "shipping information," would lead to better and cheaper services in the export industry, which, in turn, will increase the com-

petitiveness of American exporters. *Id.* It was in the course of this discussion that Rep. Fascell stated that "having some export data available—such as who is shipping what products to which countries—should help spur export competition." *Id.* Because Rep. Preyer had just declared that SEDs could be disclosed, but licensing information would be confidential, appellant's reliance on this statement seems misplaced. That Rep. Fascell was also referring to the disclosure of SEDs is supported by his use of the word "shippers" rather than "exporters." Later in the debate, Rep. Preyer emphasized the distinction between "licensing information and export information," the latter of which is derived from such shipping documents as bills of lading. 125 Cong.Rec. 25641.

and instead chose to establish a bright-line rule for nondisclosure.

These policies apply equally to the identity of licenseholders as to the identity of license applicants.[10] When combined with the statutory language, the use by Members of Congress of the terms "licenses" and "license applications" interchangeably, and the existence of other data, including notably information from the Shippers' Export Declaration, that Congress intended to prevent the department from withholding, the policy considerations compel us to conclude that Congress intended to permit the names of licenseholders to be withheld from disclosure.[11]

AFFIRMED.

10. Relying on *Irons & Sears,* 606 F.2d at 1222–23, Lessner argues by analogy to patent law. In *Irons & Sears,* the D.C. Circuit held that pending and abandoned applications may be withheld, but information relating to applications that have resulted in issued patents must be disclosed. The court, however, relied on the fact that the information in the latter category was kept in public files. *Id.* at 1222. In addition, the policy considerations are distinguishable. The need for confidentiality once a patent has been issued is greatly diminished because the business acquires protection from the patent. An export license, on the other hand, does not alleviate a business's need for secrecy.

11. Because we conclude that the information may be withheld under Exemption 3, we do not address the Exemption 4 issue.