BALDRIGE, SECRETARY OF COMMERCE, ET AL. *v.*
SHAPIRO, ESSEX COUNTY EXECUTIVE

No. 80–1436.   Argued December 2, 1981—Decided February 24, 1982*

---

*Together with No. 80–1781, *McNichols, Mayor of Denver, et al.* v. *Baldrige, Secretary of Commerce, et al.,* on certiorari to the United States Court of Appeals for the Tenth Circuit.

BURGER, C. J., delivered the opinion for a unanimous Court.

*Elliott Schulder* argued the cause for petitioners in No. 80–1436 and respondents in No. 80–1781. With him on the briefs were *Solicitor General Lee, Acting Solicitor General Wallace, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Geller, Leonard Schaitman, Michael Kimmel,* and *John Cordes.*

*George J. Cerrone, Jr.,* argued the cause for petitioners in No. 80–1781. With him on the briefs was *Max P. Zall.*

*David H. Ben-Asher* argued the cause and filed a brief for respondent in No. 80–1436.†

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to determine whether lists of addresses collected and utilized by the Bureau of the Census are exempt from disclosure, either by way of civil discovery or the Freedom of Information Act, under the confidentiality provisions of the Census Act, 13 U. S. C. §§ 8 and 9.

I

Under Art. I, § 2, cl. 3, of the United States Constitution, responsibility for conducting the decennial census rests with

---

†*Vilma S. Martinez* and *Morris J. Baller* filed briefs for the Mexican American Legal Defense and Educational Fund, Inc., as *amicus curiae* urging affirmance in No. 80–1436 and reversal in No. 80–1781.

*John E. Flaherty, Jr.,* and *Malcolm J. Hall* filed a brief for Plaintiffs in MDL–444, *In re 1980 Decennial Census Adjustment Litigation,* as *amici curiae* urging reversal in No. 80–1781.

*Robert Abrams,* Attorney General, *Frederick A. O. Schwarz, Jr., Robert S. Rifkind, Peter Bienstock,* and *Allen G. Schwartz* filed a brief for the State of New York et al. as *amici curiae.*

Congress.[1]  Congress has delegated to the Secretary of Commerce the duty to conduct the decennial census, 13 U. S. C. § 141; the Secretary in turn has delegated this function to the Bureau of the Census.  13 U. S. C. § 21.

The 1980 enumeration conducted by the Bureau of the Census indicated that Essex County, N. J., which includes the city of Newark, and Denver, Colo., among other areas, had lost population during the 1970's.  This information was conveyed to the appropriate officials in both Essex County and Denver.  Under Bureau procedures a city has 10 working days from receipt of the preliminary counts to challenge the accuracy of the census data.[2]  Both Essex County and Denver challenged the census count under the local review procedures.  Both proceeded on the theory that the Bureau had erroneously classified occupied dwellings as vacant, and both sought to compel disclosure of a portion of the address lists used by the Bureau in conducting its count in their respective jurisdictions.

---

[1] Article I, § 2, cl. 3, provides:

"Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.  The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. . . ."

Article I, § 2, cl. 3, was amended by § 2 of the Fourteenth Amendment to provide:

"Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."

The Sixteenth Amendment also altered cl. 3 to provide for direct taxation without apportionment among the states and without regard to any census or enumeration.

[2] See Revised Local Review Program Information Booklet (Apr. 1980), App. in No. 80-1436, pp. 22–48.

A

*BALDRIGE* v. *SHAPIRO (No. 80–1436)*

The Essex County Executive filed suit in the United States District Court for the District of New Jersey to compel the Bureau to release the "master address" register under the Freedom of Information Act (FOIA), 5 U. S. C. § 552.[3] The master address register is a listing of such information as addresses, householders' names, number of housing units, type of census inquiry, and, where applicable, the vacancy status of the unit. The list was compiled initially from commercial mailing address lists and census postal checks, and was updated further through direct responses to census questionnaires, pre- and post-enumeration canvassing by census personnel, and in some instances by a cross-check with the 1970 census data. The Bureau resisted disclosure of the master address list, arguing that 13 U. S. C. §§ 8(b) and 9(a) prohibit disclosure of all raw census data pertaining to particular individuals, including addresses. The Bureau argued that it therefore could lawfully withhold the information under the FOIA pursuant to Exemption 3, which provides that the FOIA does not apply where information is specifically exempt from disclosure by statute. 5 U. S. C. § 552(b)(3).

The District Court concluded that the FOIA required disclosure of the requested information. The court began its analysis by noting that public policy favors disclosure under the FOIA unless the information falls within the statutory exemptions. The District Court concluded that the Census Act did not provide a "blanket of confidentiality" for all census materials. Rather, the confidentiality limitation is

---

[3] Under 5 U. S. C. § 552(a)(4)(B), "the district court of the United States in the district in which the complainant resides . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."

"solely to require that census material be used in furtherance of the Bureau's statistical mission and to ensure against disclosure of any particular individual's response." App. to Pet. for Cert. 10a. The court noted that Essex County did not seek access to individual census reports or information relative to particular individuals, but sought access to the address list exclusively for statistical purposes in conjunction with the Bureau's own program of local review. In addition, the Secretary is authorized by the Census Act to utilize county employees if they are sworn to observe the limitations of the statute. The District Court concluded that the Bureau's claim of confidentiality impeded the goal of accurate and complete enumeration. Finally, the District Court found that the information sought was not derived from the questionnaires received, but rather from data available prior to the census. The District Court ordered the Bureau to make available the address register of all property in the county, with the proviso that all persons using the records be sworn to secrecy.[4] The United States Court of Appeals for the Third Circuit affirmed for the reasons stated by the District Court. App. to Pet. for Cert. 1a. Judgment order reported at 636 F. 2d 1210 (1980).

## B

### McNICHOLS v. BALDRIGE (No. 80–1781)

The city of Denver, through its officials, filed suit in the United States District Court for the District of Colorado seeking a preliminary injunction to require the Bureau to cooperate with the city in verifying its vacancy data.[5] The

---

[4] We note in passing that there is no provision in the FOIA for this procedure.

[5] Jurisdiction in the District Court for the District of Colorado was invoked under 28 U. S. C. §§ 1331, 1337, 1361, 2201, and 2202, under the Freedom of Information Act, 5 U. S. C. § 552, under 5 U. S. C. §§ 702, 704, and 706, and under U. S. Const., Art. I, § 2, cl. 3. The city argued

District Court did not rule on the preliminary injunction, but instead focused on whether the city of Denver was entitled to the vacancy information contained in the updated master address registers maintained by the Bureau. The District Court granted the city of Denver's discovery request for this information. The court concluded that the city should have access to the information because without the address list the city was denied any meaningful ability to challenge the Bureau's data. In light of what it deemed the important constitutional and statutory rights involved, the District Court concluded that the purposes of § 9 of the Census Act could be maintained without denying the city the right of discovery. The District Court entered a detailed order to protect the confidentiality of the information.[6]

The United States Court of Appeals for the Tenth Circuit reversed. 644 F. 2d 844 (1981). The Court of Appeals relied on the "express language" of the statute and on the "'emphatically expressed intent of Congress to protect census information.'" *Id.*, at 845, quoting *Seymour* v. *Barabba,*

---

that as a result of the erroneous undercount, Denver would be underrepresented in Congress and would be deprived of certain federal funds to which it otherwise would be entitled under the federal grant-in-aid programs that distribute funds on the basis of population. The city also argued that it would be underrepresented in the state legislature because under the Colorado Constitution apportionment of state legislative districts is based on the federal census. Colo. Const., Art. V, § 48.

The city of Denver originally sought a temporary restraining order to require the Bureau to keep open its Denver offices. The parties agreed that the offices could close so long as the Bureau kept its updated master address lists in Denver.

[6] The District Court ordered that (1) the Government must produce the updated master address registers, described as "Follow-up Address Registers" (FAR's), or a list of vacant addresses culled from the FAR's; (2) all names and other identifying references must be eliminated; (3) all city employees with access to the information must take an oath of secrecy; (4) the information must be used only for adjustment of the census; and (5) Bureau officials may at their option accompany city employees as they verify the information.

182 U. S. App. D. C. 185, 188, 559 F. 2d 806, 809 (1977). The court reasoned that Congress has the power to make census information immune from direct discovery or disclosure. The court concluded that Congress has neither made nor implied an exception covering this case. The Court of Appeals also found no indication that Congress is constitutionally required to provide the city with information to challenge the census data. The court concluded that the city of Denver's remedy must lie with Congress.

Thus, the United States Court of Appeals for the Third Circuit ordered disclosure of the master address list under the FOIA. App. to Pet. for Cert. 1a. The United States Court of Appeals for the Tenth Circuit denied discovery of similar information, concluding that the data was privileged from disclosure. 644 F. 2d 844 (1981). We granted certiorari in these cases to determine whether such information is to be disclosed under either of the requested procedures. 451 U. S. 936 (1981); 452 U. S. 937 (1981).

## II

### A

The broad mandate of the FOIA is to provide for open disclosure of public information.[7] The Act expressly recognizes, however, that public disclosure is not always in the public interest and consequently provides that agency records may be withheld from disclosure under any one of the nine exemptions defined in 5 U. S. C. § 552(b). Under Exemption 3 disclosure need not be made as to information "specifically exempted from disclosure by statute" if the statute affords the agency no discretion on disclosure, or establishes particular criteria for withholding the data, or refers to the

---

[7] This principle has been reiterated frequently by this Court. See, e.g., Weinberger v. Catholic Action of Hawaii/Peace Education Project, 454 U. S. 139 (1981); NLRB v. Robbins Tire & Rubber Co., 437 U. S. 214, 220 (1978); EPA v. Mink, 410 U. S. 73, 80 (1973).

particular types of material to be withheld. The question in *Baldrige* v. *Shapiro*, No. 80–1436, is twofold: first, do §§ 8(b) and 9(a) of the Census Act constitute a statutory exception to disclosure within the meaning of Exemption 3; and second, is the requested data included within the protection of §§ 8(b) and 9(a).

## B

Although the national census mandated by Art. I, § 2, of the Constitution fulfills many important and valuable functions for the benefit of the country as a whole, its initial constitutional purpose was to provide a basis for apportioning representatives among the states in the Congress.[8] The census today serves an important function in the allocation of federal grants to states based on population. In addition, the census also provides important data for Congress and ultimately for the private sector.[9]

---

[8] As originally enacted the decennial census was to serve both for apportioning representatives and apportioning direct taxes among the states. The ratification of the Sixteenth Amendment in 1913 amended Art. I, § 2, to provide for direct taxation without apportionment.

Even the first census takers, who had a relatively small population to deal with, encountered difficulty in taking a national census. 31 The Writings of George Washington 329 (J. Fitzpatrick ed. 1939) ("Returns of the Census have already been made from several of the States and a tolerably just estimate has been formed now in others, by which it appears that we shall hardly reach four millions; but one thing is certain our *real* numbers will exceed, greatly, the official returns of them; because the religious scruples of some, would not allow them to give in their lists; the fears of others that it was intended as the foundation of a tax induced them to conceal or diminished theirs, and thro' the indolence of the people, and the negligence of many of the Officers numbers are omitted"); 8 The Writings of Thomas Jefferson 229 (A. Lipscomb ed. 1903) (Aug. 24, 1791, letter to Wm. Carmicł ąel) ("I enclose you a copy of our census . . . . Making very small allowance for omissions, which we know to have been very great, we may safely say we are above four millions").

[9] The information obtained from the national census is used for such varied purposes as computing federal grant-in-aid benefits, drafting of legislation, urban and regional planning, business planning, and academic and so-

Although Congress has broad power to require individuals to submit responses, an accurate census depends in large part on public cooperation. To stimulate that cooperation Congress has provided assurances that information furnished to the Secretary by individuals is to be treated as confidential. 13 U. S. C. §§ 8(b), 9(a). Section 8(b) of the Census Act provides that subject to specified limitations, "the Secretary [of Commerce] may furnish copies of tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent . . . ." Section 9(a) provides further assurances of confidentiality:

> "Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, may, except as provided in section 8 of this title—
> "(1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or

cial studies. See Subcommittee on Census and Population of the House Committee on Post Office and Civil Service, The Use of Population Data in Federal Assistance Programs, Ser. No. 95–16 (Committee Print compiled by the Library of Congress 1978); S. Rep. No. 94–1256, p. 1 (1976).

During congressional debates James Madison emphasized the importance of census information beyond the constitutionally designated purposes and encouraged the new Congress to "embrace some other subjects besides the bare enumeration of the inhabitants."

"This kind of information, [Madison] observed, all legislatures had wished for; but this kind of information had never been obtained in any country. . . . If the plan was pursued in taking every future census, it would give them an opportunity of marking the progress of the society, and distinguishing the growth of every interest." 13 The Papers of James Madison 8–9 (C. Hobson & R. Rutland eds. 1981) (Debate of Jan. 25, 1790).

A bill for obtaining information as described by Mr. Madison passed the House of Representatives but "was thrown out by the Senate as a waste of trouble and supplying materials for idle people to make a book." Letter to Thomas Jefferson, id., at 41.

"(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or

"(3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports."

Sections 8(b) and 9(a) explicitly provide for the nondisclosure of certain census data. No discretion is provided to the Census Bureau on whether or not to disclose the information referred to in §§ 8(b) and 9(a). Sections 8(b) and 9(a) of the Census Act therefore qualify as withholding statutes under Exemption 3.[10] Raw census data is protected under the §§ 8(b) and 9(a) exemptions, however, only to the extent that the data is within the confidentiality provisions of the Act.

C

Essex County and various *amici* vigorously argue that §§ 8(b) and 9(a) of the Census Act are designed to prohibit disclosure of the identities of individuals who provide raw census data; for this reason, they argue, the confidentiality provisions protect raw data only if the individual respondent can be identified. The unambiguous language of the confidentiality provisions, as well as the legislative history of the Act, however, indicates that Congress plainly contemplated that raw data reported by or on behalf of individuals was to be held confidential and not available for disclosure.

---

[10] Respondent Shapiro does not dispute this conclusion. See Brief for Respondent in No. 80–1436, p. 8. The legislative history of the FOIA clearly indicates that Congress recognized that the Census Act constituted a specific exemption under Exemption 3. See, *e. g.*, S. Rep. No. 1621, 85th Cong., 2d Sess., 9 (1958); 104 Cong. Rec. 6549–6550 (1958) (remarks of Rep. Moss); 112 Cong. Rec. 13646 (1966) (remarks of Rep. Olsen) ("information . . . or sources of information" given to the Bureau of the Census will be held confidential under Exemption 3); H. R. Rep. No. 1497, 89th Cong., 2d Sess. (1966); 122 Cong. Rec. 24211 (1976) (remarks of Reps. Abzug and McCloskey).

We begin first with the language of §§ 8(b) and 9(a). *Watt v. Energy Action Educational Foundation*, 454 U. S. 151 (1981). Section 8(b) allows the Secretary to provide statistical materials "which do not disclose *the information* reported by, or on behalf of, any particular respondent . . . ." (Emphasis added.) The focus of § 9(a) is also on the information that constitutes the statistical compilation. The Secretary is prohibited from using the "information" except for statistical purposes and is prohibited from publication "whereby the *data* furnished by any particular establishment or individual under this title can be identified . . . ." (Emphasis added.)

The language of each section refers to protection of the "information" or "data" compiled. In addition, the provisions of § 8(b) prohibit disclosure of data provided "by, or on behalf of," any respondent. By protecting data revealed "on behalf of" a respondent, Congress further emphasized that the data itself was to be protected from disclosure.

The legislative history also makes clear that Congress was concerned not solely with protecting the identity of individuals. Since 1879 Congress has expressed its concern that confidentiality of data reported by individuals also be preserved. At that time each census taker was required by law to take an oath "not [to] disclose any information contained in the schedules, lists, or statements." Act of Mar. 3, 1879, ch. 195, § 7, 20 Stat. 475, and Act of Apr. 20, 1880, ch. 57, 21 Stat. 75.[11] As a result of the detailed questions asked in the 1880 and 1890 censuses, Congress amended the Census Act

---

[11] Concern for confidentiality in census taking was expressed as early as the 1840 census in which each census enumerator was instructed to "consider all communications made to him in the performance of [his] duty, relative to the business of the people, as strictly confidential." Subcommittee on Energy, Nuclear Proliferation and Federal Services of the Senate Committee on Governmental Affairs, The Decennial Census: An Analysis and Review, 96th Cong., 2d Sess., 113 (Committee Print compiled by the Library of Congress 1980) (hereinafter Decennial Census). See also A. Scott, Census, U. S. A. 29 (1968). The 1870 census instructions emphatically stated that "[a]ll disclosures should be treated as strictly

to broaden the confidentiality protections.   Act of Mar. 3, 1899, ch. 419, § 21, 30 Stat. 1020.   The law restricted disclosure unless the Director of the Census authorized that the information be revealed.   The governor of any state or the chief officer of any municipal government upon request, however, could receive a list of individuals counted within the territory of the jurisdiction.   § 30, 30 Stat. 1021.   The Director of the Census frequently was asked to disclose information to cities complaining of undercounts.   For example, data was revealed to New York City after the 1890 census in order to allow the city to challenge the accuracy of the federal count.   House Committee on the Eleventh Census, Reenumeration of New York City, 51st Cong., 2d Sess. (1890). See also Decennial Census, at 113–138.

In 1929 Congress again amended the Census Act and provided the confidentiality provisions of § 9.   Act of June 18,

---

confidential, with the exception hereafter to be noted in the case of the mortality schedule. . . ." Decennial Census, at 114.   The 1909 revisions of the Census Act stated that "[n]o publication shall be made by the Census Office whereby the *data* furnished by any particular establishment can be identified . . . ."   Act of July 2, 1909, ch. 2, § 25, 36 Stat. 9 (emphasis added).   See also Act of Apr. 2, 1924, ch. 80, § 3, 43 Stat. 31; Act of June 18, 1929, ch. 28, § 8, 46 Stat. 23; Act of July 25, 1947, ch. 331, 61 Stat. 458; Act of Aug. 31, 1954, Pub. L. 740, 68 Stat. 1013–1014; Act of Oct. 15, 1962, Pub. L. 87–813, 76 Stat. 922 (overriding decision in *St. Regis Paper Co.* v. *United States*, 368 U. S. 208 (1961), by prohibiting disclosure of copy of census report retained by business establishment).

For a more detailed history of the provisions of confidentiality see C. Kaplan & T. Van Valey, Census '80: Continuing the Factfinder Tradition 68–71 (U. S. Dept. of Commerce, 1980).

Recognition of the need for some degree of confidentiality of census materials is indicated in the confidentiality provisions of several foreign nations.   Canada, France, Germany, Great Britain, Italy, Japan, The Netherlands, and Sweden make some provision for the confidentiality of census materials.   See Senate Committee on Post Office and Civil Service, Laws on the Confidentiality of Census Records in Western Europe, Canada, and Japan, 94th Cong., 2d Sess. (Committee Print compiled by the Library of Congress 1976).

1929, ch. 28, § 11, 46 Stat. 25. The amendment gave the Director of the Census no discretion to release data, regardless of the claimed beneficial effect of disclosure. The confidentiality provisions extended to all information collected by the Bureau of the Census. Decennial Census, at 116. No special access was granted to states or municipalities. In 1976 the confidentiality provision of § 8 was strengthened "to add further protection of privacy" by prohibiting disclosure of information "reported by, or on behalf of, any respondent." S. Rep. No. 94–1256, pp. 3–4 (1976). See also H. R. Conf. Rep. No. 94–1719, p. 10 (1976). The prohibitions of disclosure of "material which might disclose information reported by, or on behalf of, any respondent" extend both to "public and private entities," S. Rep. No. 94–1256, *supra*, at 4, further indicating that the municipalities requesting disclosure of raw census data have no special claim to the information.

The foregoing history of the Census Act reveals a congressional intent to protect the confidentiality of census information by prohibiting disclosure of raw census data reported by or on behalf of individuals. Subsequent congressional action is consistent with this interpretation. In response to claimed undercounts in the census of 1960 and of 1970, Congress considered, but ultimately rejected, proposals to allow local officials limited access to census data in order to challenge the census count. See H. R. 8871, 95 Cong., 1st Sess. (1977); Hearings on H. R. 8871 before the Subcommittee on Census and Population of the House Committee on Post Office and Civil Service, 95th Cong., 1st Sess. (1977).

A list of vacant addresses is part of the raw census data— the information—intended by Congress to be protected. The list of addresses requested by the County of Essex constitutes "information reported by, or on behalf of," individuals responding to the census. The initial list of addresses is taken from prior censuses and mailing lists. This information then is verified both by direct mailings and census enumerators who go to areas not responding. See, *e. g.*, 1980

Census Questionnaire, Question No. H4 ("How many living quarters, occupied and vacant, are at this address?"). As with all the census material, the information on vacancies was updated from data obtained from neighbors and others who spoke with the followup census enumerators. The final master address list therefore includes data reported by or on behalf of individuals.

Under the clear language of the Census Act it is not relevant that the municipalities seeking the data will use it only for statistical purposes. Section 9(a)(1) permits use of the data only for "the statistical purposes for which it is supplied." There is no indication in the Census Act that the hundreds of municipal governments in the 50 states were intended by Congress to be the "monitors" of the Census Bureau.[12] In addition, limiting use of data only for "statistical" purposes in no way indicates that raw data may be revealed outside the strict requirements of the Census Act that data be handled by census employees sworn to secrecy.[13]

Because §§ 8(b) and 9(a) of the Census Act constitute withholding statutes under Exemption 3 of the FOIA and because the raw census data in this case was intended to be protected from disclosure within those provisions of the Census Act, the requested information is not subject to disclosure under the FOIA.

---

[12] Congress may well have concluded that the controversy over the "vacant" or "occupied" status of property months after the census was taken could lead to interminable litigation and impair the constitutional and statutory purposes of the census.

Approximately 50 lawsuits have been brought by local governments claiming an undercount from the 1980 census. See, e. g., In re 1980 Decennial Census Adjustment Litigation, 506 F. Supp. 648 (J. P. M. D. L. 1981); Carey v. Klutznick, 653 F. 2d 732 (CA2), cert. pending sub nom. Carey v. Baldrige, No. 81–752.

[13] Although § 9(a)(1) allows use of census data for "statistical" purposes, it remains subject to § 8(b), which prohibits public disclosure of information reported by or on behalf of individuals.

## III

The discovery provisions of the Federal Rules of Civil Procedure, similar to the FOIA, are designed to encourage open exchange of information by litigants in federal courts. Unlike the FOIA, however, the discovery provisions under the Federal Rules focus upon the need for the information rather than a broad statutory grant of disclosure.[14] Federal Rule of Civil Procedure 26(b)(1) provides for access to all information "relevant to the subject matter involved in the pending action" unless the information is privileged. If a privilege exists, information may be withheld, even if relevant to the lawsuit and essential to the establishment of plaintiff's claim.

It is well recognized that a privilege may be created by statute.[15] A statute granting a privilege is to be strictly construed so as "to avoid a construction that would suppress otherwise competent evidence." *St. Regis Paper Co.* v. *United States*, 368 U. S. 208, 218 (1961). In the case of the city of Denver, the central inquiry is whether §§ 8(b) and 9(a) create a privilege so as to protect against disclosure of the raw census data requested.[16]

---

[14] The primary purpose of the FOIA was not to benefit private litigants or to serve as a substitute for civil discovery. See *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132, 143, n. 10 (1975); *Renegotiation Bd.* v. *Bannercraft Clothing Co.*, 415 U. S. 1, 24 (1974).

[15] Most courts have concluded that an FOIA exemption does not automatically constitute a "privilege" within the meaning of the Federal Rules of Civil Procedure. See, *e. g.*, *Frankel* v. *SEC*, 460 F. 2d 813, 818 (CA2 1972) (information exempt under FOIA may be obtained through discovery if party's need for information exceeds Government's need for confidentiality). See Toran, Information Disclosure in Civil Actions: The Freedom of Information Act and the Federal Discovery Rules, 49 Geo. Wash. L. Rev. 843, 848–854 (1981).

[16] Federal Rule of Evidence 501 provides that *"[e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress* . . . the privilege of a witness . . . [or] government . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." (Emphasis added.)

As noted above, § 8(b) and § 9(a) of the Census Act embody explicit congressional intent to preclude *all* disclosure of raw census data reported by or on behalf of individuals. This strong policy of nondisclosure indicates that Congress intended the confidentiality provisions to constitute a "privilege" within the meaning of the Federal Rules. Disclosure by way of civil discovery would undermine the very purpose of confidentiality contemplated by Congress. One such purpose was to encourage public participation and maintain public confidence that information given to the Census Bureau would not be disclosed. The general public, whose cooperation is essential for an accurate census, would not be concerned with the underlying rationale for disclosure of data that had been accumulated under assurances of confidentiality. Congress concluded in §§ 8(b) and 9(a) that only a bar on disclosure of all raw data reported by or on behalf of individuals would serve the function of assuring public confidence. This was within congressional discretion, for Congress is vested by the Constitution with authority to conduct the census "as they shall by Law direct." [17] The wisdom of its classifications is not for us to decide in light of Congress' 180 years' experience with the census process.

---

[17] It is not unlikely that while checking the Bureau vacancy figures the city of Denver would speak to individuals who had supplied vacancy data to the Bureau. Even though the city might not be able to identify the individuals who originally gave the information, there would nonetheless be the *appearance* that confidentiality had been breached.

Congress has several times rejected proposals designed to assure availability of census records to historians and other legitimate researchers. See, *e. g.*, S. 3279, H. R. 10686, 94th Cong., 2d Sess. (1976). "Concerns about the legislation raised by the Bureau of the Census and others soon made it apparent that benefits gained from the release of census records could be easily offset by a loss of credibility for the census, as well as damage to the reputations of individual citizens." Senate Committee on Post Office and Civil Service, Laws on the Confidentiality of Census Records in Western Europe, Canada, and Japan, 94th Cong., 2d Sess. (Committee Print compiled by the Library of Congress 1976) (Foreword by Sen. McGee, Chairperson).

This is not to say that the city of Denver does not also have important reasons for requesting the raw census data for purposes of its civil suit. A finding of "privilege," however, shields the requested information from disclosure despite the need demonstrated by the litigant.

## IV

We hold that whether sought by way of requests under the FOIA or by way of discovery rules, raw data reported by or on behalf of individuals need not be disclosed. Congress, of course, can authorize disclosure in executing its constitutional obligation to conduct a decennial census. But until Congress alters its clear provisions under §§ 8(b) and 9(a) of the Census Act, its mandate is to be followed by the courts.

Accordingly the judgment of the United States Court of Appeals for the Third Circuit in No. 80–1436 is reversed, and the judgment of the United States Court of Appeals for the Tenth Circuit in No. 80–1781 is affirmed.

*It is so ordered.*