# In the United States Court of Federal Claims

No. 12-303C

(Filed: May 28, 2013)

| | | |
|---|---|---|
| ********************************** | ) | Patent case; production in discovery of |
| | ) | information related to or derived from |
| **HITKANSUT LLC, a Michigan** | ) | cooperative research and development |
| **corporation, & ACCELEDYNE** | ) | agreements; statutory protection against |
| **TECHNOLOGIES, LTD., LLC, a** | ) | disclosure; 15 U.S.C. § 3710a(c)(7); |
| **Michigan corporation,** | ) | inventor's access to confidential technical |
| | ) | information of opposing party |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| ********************************** | | |

John S. Artz, Dickinson Wright, PLLC, Troy, Michigan, for plaintiffs. With him on the briefs was J. Bradley Luchsinger, Dickinson Wright, PLLC, Troy, Michigan.

Gary L. Hausken, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Principal Deputy Assistant Attorney General, and John Fargo, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiffs Hitkansut LLC and Acceledyne Technologies, Ltd., LLC (collectively, "Hitkansut") have moved to compel the production from the government of information related to or derived from cooperative research and development agreements ("CRADAs") to which the government is a party. Hitkansut also asks the court to enter a protective order that grants Ms. Donna Walker, a principal of both plaintiff corporations, access to confidential technical information. The issues have been fully briefed, and a hearing was held on March 25, 2013. The motion is accordingly ready for disposition.

## BACKGROUND

Hitkansut filed suit in this court on May 10, 2012, alleging that the government had infringed its patent, United States Patent No. 7,175,722 ("the '722 patent"), and seeking to

recover compensation for an allegedly infringing use by Oak Ridge National Laboratory ("Oak Ridge" or "the government"). Compl. ¶¶ 1, 10. It contends that the '722 patent protects "a method of achieving a desired physical property in a structure . . . through the concurrent application of two different energies. . . . The first energy may be thermal energy (*i.e.* heat) and the second energy may be mechanical vibration, sonic, laser, microwave, or magnetic energy." Brief in Support of Pls.' Mot. to Compel and For Entry of a Protective Order ("Pls.' Mot.") at 1-2, ECF No. 11. Hitkansut alleges that Oak Ridge employs a thermomagnetic processing means in research and in contractual CRADAs with private entities, and that research and those contracts infringe the '722 patent. *Id.* at 2-3. The government disputes these claims. Resp. of the United States to Pls.' Mot. to Compel and for Entry of a Protective Order ("Def.'s Opp'n") at 3, ECF No. 12.

After the suit progressed into the discovery phase, Hitkansut moved pursuant to Rule 37(a) of the Rules of the Court of Federal Claims ("RCFC") to compel the production of information derived from, and related to, CRADAs which were entered into by the government with private, third-party partners. *See* Pls.' Mot. at 2-3.[1] Hitkansut seeks to learn how the government's allegedly infringing "process was operated, under what parameters, [using] what temperatures and what times." Hr'g Tr. 6:11-21 (Mar. 25, 2013). It also seeks disclosure of financial information related to the CRADAs because that information is "relevant to . . . a determination of the amount of compensation owed to [Hitkansut] for any infringement and the commercial success of the [thermomagnetic process at issue]." Pls.' Mot. at 4; *see also* Hr'g Tr. 41:5-9. The government avers that it has withheld information provided by third-party CRADA partners pursuant to a privilege set forth in Section 11 of the Stevenson-Wydler Technology Innovation Act of 1980, Pub. L. No. 96-480, 94 Stat. 2311, as amended by the Federal Technology Transfer Act, Pub. L. No. 99–502, 100 Stat 1785, 1797 (1986) (codified as amended at 15 U.S.C. § 3710a) ("FTTA" or "the Act"), specifically at 15 U.S.C. § 3710a(c)(7). *See* Def.'s Opp'n at 7.

---

[1]A CRADA is defined by statute as

> [A]ny agreement between one or more [f]ederal laboratories and one or more non-[f]ederal parties under which the [g]overnment, through its laboratories, provides personnel, services, facilities, equipment, intellectual property, or other resources with or without reimbursement (but not funds to non-[f]ederal parties) and the non-[f]ederal parties provide funds, personnel, services, facilities, equipment, intellectual property, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory; except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of Title 31.

15 U.S.C. § 3710a(d)(1).

Hitkansut also asks the court to enter a protective order that permits its principal, Ms. Walker, the inventor of the '722 patent, access to non-financial, confidential technical information obtained in discovery from the government and third parties. Pls.' Mot. at 11-12. It argues that access by Ms. Walker is necessary for plaintiff to "evaluate technical information concerning the accused thermomagnetic process. . . . Specialized knowledge of materials science, metallurgy, physics, and mathematics all come into play in understanding this pioneering technology. . . . [T]he advice of Ms. Walker is essential to the proper handling of this litigation." *Id.* at 11. The government opposes such a grant of access in a protective order, arguing that Ms. Walker is a decisionmaker at and consultant to competitors of Oak Ridge and its third-party partners, and thus should be barred from accessing proprietary information under RCFC 26(c)(1). Def.'s Opp'n at 15, 17-21.

## ANALYSIS

### I. *15 U.S.C. § 3710a(c)(7)(A) and (B)*

The FTTA authorizes the director of any laboratory operated by the federal government to enter into CRADAs with private entities, in part to encourage transfer of technology from federal government-operated laboratories to private industry. *See* 15 U.S.C. § 3710a(a)(1); *Chemical Serv., Inc. v. Environmental Monitoring Sys. Lab.-Cincinnati of the U.S. E.P.A.*, 12 F.3d 1256, 1258 (3d Cir. 1993). The statutory provision at issue in this instance, Paragraph 3710a(c)(7), provides two types of protection from disclosure for "trade secrets or commercial or financial information that is privileged or confidential," depending upon the source of the information. *See DeLorme Publ'g Co. v. National Oceanic and Atmospheric Admin. of the U.S. Dep't of Commerce*, 917 F. Supp. 867, 872 (D. Maine 1996). Paragraph 3710a(c)(7) states:

> (A) No trade secrets or commercial or financial information that is privileged or confidential, under the meaning of section 552(b)(4) of Title 5 [the Freedom of Information Act ("FOIA")], which is obtained in the conduct of research or as a result of activities under this chapter from a non-[f]ederal party participating in a cooperative research and development agreement shall be disclosed.

> (B) The director, or in the case of a contractor-operated laboratory, the agency, for a period of up to 5 years after development of information that results from research and development activities conducted under this chapter and that would be a trade secret or commercial or financial information that is privileged or confidential if the information had been obtained from a non-[f]ederal party participating in a cooperative research and development agreement, may provide appropriate protections against the dissemination of such information, including exemption from subchapter II of chapter 5 of Title 5.

15 U.S.C. § 3710a(c)(7). Subparagraph (c)(7)(A) pertains to information obtained by or derived from a private party participating in a CRADA, and Subparagraph (c)(7)(B) concerns information belonging to the federal party. The decision in *DeLorme* applied the latter of these provisions.

3

In *DeLorme*, a plaintiff sought disclosure under FOIA of electronic "raster" compilations of National Oceanic and Atmospheric Administration's ("NOAA's") nautical charts. 917 F. Supp. at 870. Among other things, FOIA allows agencies to withhold records that are "specifically exempted from disclosure by statute," *i.e.*, where a statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). The court in *DeLorme* explained that 15 U.S.C. § 3710a(c)(7) was such a statute limiting disclosure, and deemed NOAA's raster compilations to be commercial and confidential information that resulted from research and development activities under the FTTA. 917 F. Supp. at 872-74. Thus, it held that NOAA, pursuant to Subparagraph 3710a(c)(7)(B), was empowered to withhold its "raster" compilations for a period of up to five years from the date of their development. *Id.* at 874.

Other cases have examined the first provision, Subparagraph 3710a(c)(7)(A), which governs disclosure of qualifying information belonging to a private party to a CRADA. In *Spectrum Scis. & Software, Inc. v. United States*, 84 Fed. Cl. 716 (2008), a private supplier brought a breach of contract suit against the government, alleging that the Air Force breached the terms of its CRADA by releasing the private supplier's proprietary information. 84 Fed. Cl. at 734. The court's decision opined that Subparagraph (A) of § 3710a(c)(7) "flatly prohibit[s] agencies from disclosing private commercial information 'obtained in the conduct of research . . . from a non-[f]ederal party participating in a [CRADA].'" *Id.* at 737 (quoting 15 U.S.C. § 3710a(c)(7)(A)); *see also Demodulation, Inc. v. United States*, 103 Fed. Cl. 794 (upholding subject matter jurisdiction over a patentee's claim against the government for a government contractor's breach of a CRADA which prohibited disclosure of the patentee's trade secrets and proprietary technology); *D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205 (2010) (concluding that a CRADA was enforceable as a contract between the government and the private partner).

As these cases illustrate, Paragraph 3710a(c)(7) provides two distinct protections for qualifying information, which vary according to the source of the qualifying information. "[I]f qualifying information is obtained from the CRADA's private partner . . . it cannot be disclosed. However, if qualifying information is obtained from the agency and would have been protected if it had come from the private partner, the agency has the discretion to withhold it, but only for a five-year period." *DeLorme*, 917 F. Supp. at 872; *see also Spectrum Scis.*, 84 Fed. Cl. at 734. Hitkansut and the government diverge in their views of the relevance of the first of these protections to this litigation. Hitkansut argues that the statute prohibits an agency from *publicly* disclosing qualifying information of a private CRADA partner, but that the information should be disclosed in discovery subject to a protective order. Pls.' Mot. at 9-10. The government contends that the plain language of Subparagraph 3710a(7)(A) "provides an absolute bar to the [g]overnment's production of [qualifying] trade secrets or commercial or financial information in civil litigation." Def.'s Opp'n at 4.

## A. *Privilege*

RCFC 26(b)(1) states that "[p]arties may obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense." RCFC 26(b)(1) (emphasis added). The

rule, by its text, excludes from discovery information for which a privilege exists, such that privileged "information may be withheld, even if relevant to the lawsuit and essential to the establishment of plaintiff's claim." *Baldrige v. Shapiro*, 455 U.S. 345, 360 (1982).[2]  "It is well recognized that a privilege may be created by statute[, although a] statute granting a privilege is to be strictly construed so as 'to avoid a construction that would suppress otherwise competent evidence.'" *Id.* (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 218 (1961)).  When inquiring whether a statute creates a privilege, courts "begin with the plain language of the statute in question." *In re England*, 375 F.3d 1169, 1177 (D.C. Cir. 2004) (Roberts, J.).  If "the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917))); *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").  A statute's wording may be "awkward, and even ungrammatical; but that does not make it ambiguous on the point at issue." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004); *see also In re Any & All Funds or Other Assets in Brown Bros. Harriman & Co. Account No. 8870792 in Name of Tiger Eye Invs., Ltd.*, 601 F. Supp. 2d 252, 259-60 (D.D.C. 2009),  *aff'd*, 613 F.3d 1122 (D.C. Cir. 2010, *superseded by statute on other grounds*, Preserving Foreign Criminal Assets for Forfeiture Act of 2010, Pub. L. No. 111-342, 124 Stat. 3607, *as recognized in In re Seizure of Approximately $12,116,153.63 & Accrued Interest in U.S. Currency*, __ F. Supp. 2d __, 2012 WL 5463306, at *6 (D.C.C. Nov. 9, 2012)).

In pertinent part, Subparagraph 3710a(c)(7)(A) states: "No trade secrets or commercial or financial information that is privileged or confidential, under the meaning of section 552(b)(4) of Title 5 [FOIA], which is obtained in the conduct of research or as a result of activities under this chapter from a non-[f]ederal party participating in a cooperative research and development agreement shall be disclosed."  The plain text of this provision connotes a bar to agency disclosure of qualifying information obtained from a private party to a CRADA.[3]  The reference to FOIA serves to define the scope of protected information; it does not signify that the statutory bar on disclosure pertains only to an agency's responses to requests made under FOIA.  To the contrary, the prohibition against disclosure exists broadly in Subparagraph 3710a(c)(7)(A).  That

---

[2]The RCFC generally mirror the Federal Rules of Civil Procedure. *See* RCFC 2002 Rules Committee Note ("[I]nterpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure.").  RCFC 26(b)(1) is nearly identical to Fed. R. Civ. P. 26(b)(1), and the court consequently will rely on cases interpreting Fed. R. Civ. P. 26 in its inquiry and analysis.

[3]Final CRADA reports generally are made publicly available. *See, e.g.,* Hr'g Tr. 39:22-24; *Information Bridge: Department of Energy Office of Scientific & Technical Information*, available at http://www.osti.gov/bridge (last visited May 24, 2013).  The government submitted to the court final CRADA reports that are publicly available.  The parties, however, have not provided the court with the text of any of the CRADAs that underpin those reports or, indeed, any CRADAs whatsoever.

breadth "indicates that Congress intended the confidentiality provision[] to constitute a 'privilege' within the meaning of the [RCFC]." *Baldrige*, 455 U.S. at 361. Because the statute is "unambiguous, judicial inquiry is complete, and resort to the more controversial realm of legislative history is unnecessary." *In re England*, 375 F.3d at 1178 (internal citations omitted).[4] In sum, information qualifying for protection under Subparagraph 3710a(c)(7)(A) may not be obtained from the government through discovery in civil litigation.[5] The government may therefore withhold production of qualifying information on the basis of this statutory privilege.[6]

In contrast to the prohibition embodied in Subparagraph 3710a(c)(7)(A), the plain language of Subparagraph 3710a(c)(7)(B) is permissive, not categorical. It states that an agency "may provide appropriate protections against the dissemination of [qualifying agency] information, including exemption from [FOIA,]" for up to five years after development of such information. 15 U.S.C. § 3710a(c)(7)(B). As written, this provision provides no mandate that would give rise to a cognizable privilege. *See Baldrige*, 455 U.S. at 360 ("It is well recognized that a privilege may be created by statute[, although a] statute granting a privilege is to be strictly construed so as 'to avoid a construction that would suppress otherwise competent evidence.'" (quoting *St. Regis Paper*, 368 U.S. at 218)). Rather, it allows the government to avail itself of a limited protection, *i.e.*, an exemption from disclosure under FOIA for a finite time period, to safeguard its qualifying research information and avoid public dissemination. It does not create a privilege for such information during civil discovery, where a protective order may provide appropriate protections against public distribution.

---

[4]In all events, the legislative history is confirmatory because it indicates that Subparagraph 3710a(c)(7)(A) was structured such that "non-participating companies would not be able to obtain the [private partner's confidential] information from the government or the [government-owned contractor-operated laboratory] operator under FOIA *or otherwise*." H.R. Rep. No. 101-331 (1989) (Conf. Rep.), *reprinted in* 1989 U.S.C.C.A.N. 977, 1150-51, *and at* 1989 WL 168132 (emphasis added).

[5]It is of no consequence that Subparagraph 3710a(c)(7)(A) does not refer specifically to a prohibition on disclosure in civil discovery. *See In re England*, 375 F.3d at 1179 (rejecting an approach to statutory construction that requires such specificity and citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (citations omitted))); *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) ("[T]he Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application.").

[6]As with other claims of privilege made during civil litigation, however, the withholding party must make the claim of privilege and "describe the nature of the documents, communications, or tangible things not produced or disclosed." RCFC 26(b)(5)(ii). This requirement "is commonly satisfied by filing a privilege log." *Wolk v. Green*, No. C06-5025 BZ, 2007 WL 3203050, at *2 (N.D. Cal. Oct. 29, 2007). Apparently no privilege log has yet to be submitted by the government in this case, although documents and records subject to the government's statutory privilege claim pursuant to Subparagraph 3710a(c)(7)(A) should be included within such a log.

6

B. *The Scope of Information Protected Under Subparagraph 3710a(c)(7)(A)*

15 U.S.C. § 3710a(c)(7)(A) prohibits governmental disclosure of "trade secrets or commercial or financial information that is privileged or confidential . . . which is obtained in the conduct of research or as a result of activities under [the Technology Innovation chapter of Title 15, 15 U.S.C. §§ 3701-3722] from a non-[f]ederal party participating in a cooperative research and development agreement."[7]  The Subparagraph first limits the scope of protection to information belonging to a non-federal entity that is a signatory to a CRADA.  Information "obtained in the conduct of research" after a CRADA has been signed is protected by the plain language of the provision.  The salient issue is the breadth of the phrase that follows, which protects qualifying information obtained "as a result of activities under" the chapter.  The statute does not specify what these activities might be, although the chapter encompasses research conducted via grants or cooperative agreements designed to promote technology development and efforts to "stimulat[e] improved utilization of federally funded technology developments, including inventions, software, and training technologies, by [s]tate and local governments and the private sector."  15 U.S.C. § 3702(3); *see also* 15 U.S.C. §§ 3701-3722.  The broad scope of the chapter indicates that a range of "activities under" the chapter could produce or generate pertinent information, including information that might be obtained prior to the signing of a CRADA with a view to potential participation in a CRADA.

The legislative history pertaining to 15 U.S.C. § 3710a(c)(7) supports such a reading.  It states that the provision is designed to "exempt from public disclosure certain information *brought into* a CRADA or generated under a CRADA."  H.R. Rep. No. 101-331 at 761, *reprinted at* 1989 U.S.C.C.A.N. at 1150-51 (emphasis added).  The *DeLorme* court acknowledged the breadth of 15 U.S.C. § 3710a(c)(7) in interpreting Subparagraph 3710a(c)(7)(B), which provides limited protection to qualifying government information "that results from research and development activities conducted under [the] chapter."  The court, after considering the language of the statute and legislative history, concluded that the phrase "conducted under" "is obviously broad and not limited to what happens after a particular CRADA is signed . . . [such that government files] created in anticipation of [a] CRADA qualify as 'activities conducted under' the Technology Innovation chapter."  *DeLorme*, 917 F. Supp. at 873.  This court concurs and concludes that Subparagraph 3710a(c)(7)(A) protects qualifying information that pertains to a CRADA and is disclosed by a non-federal party in negotiations, discussions, and submissions that occur or are made prior to the signing of a CRADA, whether or not that information is stated in the CRADA, as well as information provided by the party after the CRADA has been executed.

Subparagraph 3710a(c)(7)(A) limits protection to "trade secrets or commercial or financial information that is privileged or confidential, under the meaning of [FOIA Exemption

---

[7]The parties have not presented arguments concerning what might occur if Hitkansut seeks third-party discovery from private parties to CRADAs.  The government submits that the privilege provided by Subparagraph 3710a(c)(7)(A) only pertains to governmental disclosure of private-party information and does not necessarily shelter from disclosure information in the hands of third parties.  Def.'s Opp'n at 10 n.1.

4, 5 U.S.C. § 552(b)(4)]." 15 U.S.C. § 3710a(c)(7)(A). Accordingly, to assess the scope of the Subparagraph, the court must look to precedents that define and apply the relevant terms as used in Exemption 4 of FOIA. For the purposes of FOIA, courts have defined trade secret "as a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Public Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1288 (D.C. Cir. 1983); *see also Anderson v. Department of Health & Human Servs.*, 907 F.2d 936, 943-44 (10th Cir. 1990). The terms "commercial" or "financial" are to be given their ordinary meanings, *National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002), and are construed broadly, *Soghoian v. Office of Mgmt. & Budget*, __ F. Supp. 2d __, __, 2013 WL 1201488, at *3 (D.D.C. Mar. 26, 2013); *COMPTEL v. FCC*, __ F. Supp. 2d __, __, 2012 WL 6604528, at *7 (D.D.C. Dec. 19, 2012). Commercial information "need not be limited to information that 'reveal[s] basic commercial operations,' but may include any information in which the submitter has a 'commercial interest,' such as business sales statistics, research data, overhead and operating costs, and financial conditions." *COMPTEL*, 2012 WL 6604528, at *7 (internal citation omitted) (quoting *Public Citizen Health Research Grp.*, 705 F.2d at 1290); *see also DeLorme*, 917 F. Supp. at 873. Nonetheless, commercial or financial information also must be privileged or confidential to be protected. Information voluntarily submitted[8] to the government is confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992); *see also United Techs. Corp. v. United States Dep't of Def.*, 601 F.3d 557, 559 n.3 (D.C. Cir. 2010); *COMPTEL*, 2012 WL 6604528, at *7. This is an objective test, and the government bears the burden of proving the custom of a provider. *Critical Mass*, 975 F.2d at 879.

In this instance, the government asserts that a broad range of commercial and financial information provided by private CRADA partners is confidential within the meaning of Subparagraph 3710a(c)(7)(A). *See* Hr'g Tr. 23:23 to 24:12; 33:4-16. In particular, the government contends that the provision protects against disclosure the amount of payments made by private CRADA partners to finance research under a CRADA because these contributions are "financial information . . . obtained in a CRADA arrangement." Hr'g Tr. 29:15 to 30:14. To support its position, the government has provided the declaration of an employee at Eaton Corp. (the "Eaton declaration"). *See* Def.'s Opp'n, App. at A35-38. Two CRADAs between Eaton Corp. and the government apparently contain information that Hitkansut is seeking in connection with this case. *See* Def.'s Opp'n, App. at A35-36. The Eaton declaration asserts that the company has disclosed two categories of confidential information to the government in connection with its CRADAs:

> (i) *technical information, know-how and trade secrets*; and
> (ii) *business and commercial projections* that disclose important competitive information about Eaton's view of the market for its own future projects. The confidential technical information includes the material specifications,

---

[8]CRADAs are agreements that are voluntarily entered into by the government and a private party.

> manufacturing process mechanisms or tooling that could be utilized. The competitive information includes an identification and number of parts that could have been manufactured using the technology and manufacturing costs.

Def.'s Opp'n, App. at A36 (emphasis added).

The court accepts that such technical information and commercial projections are commercial or financial information, and that this information is confidential because it would not customarily be released publicly by a private CRADA partner. Contrastingly, simple transactional data, such as payments made by a CRADA partner to the government, are not encompassed within either of the categories delineated by the Eaton declaration. Final or incremental payments made to the government by a private party under a CRADA are not, standing alone, commercial projections of a financial nature as described by the Eaton declaration. The government has not offered any other evidence that suggests its partners would ordinarily keep confidential information about such payments. Consequently, the court concludes that payments made by CRADA partners to the government are not confidential information protected by Subparagraph 3710a(c)(7)(A).

## II. *Scope of Protective Order*

Hitkansut's request that a protective order permit Ms. Walker, its principal, access to proprietary technical information produced by the government in the course of this litigation rests on the contention that her participation is necessary to enable plaintiffs to conduct a proper infringement evaluation. *See* Pls.' Mot. at 11. Hitkansut contends that such an evaluation requires "a thorough analysis of a highly specialized and technical material processing field." *Id.* Hitkansut states that the government is quite familiar with Ms. Walker because it previously entrusted her with confidential information when it executed a nondisclosure agreement with her in connection with her work as a guest researcher at Oak Ridge. *See* Pls.' Mot. at 15-16. The government counters that Ms. Walker is a decisionmaker and consultant to companies which compete with Oak Ridge and its CRADA partners, and it urges that she be denied access to proprietary information subject to the protective order. *See* Def.'s Opp'n at 15, 19-20.

RCFC 26(c)(1) allows the court, for good cause, to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." "[T]here is no absolute privilege for trade secrets and similar confidential information." *Federal Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979) (quoting 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2043, p. 300 (1970)). The party resisting discovery must first establish that the information sought is a trade secret or other confidential information under the Rule and demonstrate that its disclosure might be harmful. *See Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981). If that showing has been made, the burden then shifts to the party seeking discovery to establish that the disclosure of trade secrets or other confidential information is relevant and necessary to the action. *Id.* The

court must balance the need for the trade secrets or other confidential information against the claim of injury resulting from disclosure. *Id.*; *see also MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 500 (D. Kan. 2007).

In practice, "orders forbidding any disclosure of trade secrets or confidential commercial information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel, or to the parties." *Federal Open Mkt. Comm.*, 443 U.S. at 362 n.24 (internal citations omitted). Such a statement holds true in this instance. Hitkansut and the government have agreed that proprietary information will be produced in discovery, and that entry of a protective order is appropriate; they only diverge on whether Ms. Walker should be permitted access to trade secrets or other proprietary technical information produced by the government. *See* Def.'s Opp'n at 17; Pls.' Mot. at 12. The Federal Circuit has noted that "[m]eaningful increments of protection are achievable in the design of a protective order. It may be that particular circumstances may require specific provisions in such orders. . . . In a particular case, *e.g.*, where [corporate employees] are involved in competitive decisionmaking, it may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed." *United States Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984); *see also Ross-Hime Designs, Inc. v. United States*, 109 Fed. Cl. 725, 742-44 (2013) (ruling that access to protected information would not be granted to plaintiff's president who was likely to be involved in competitive decision-making). Courts presiding over patent cases have often crafted protective orders that address the need to limit access to protected technical information. In that context, the court finds instructive the analysis in *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*, 682 F. Supp. 20 (D. Del. 1988).

The plaintiff in *Safe Flight* sought a protective order that would allow Safe Flight's president to examine scientific documents that the defendant considered confidential. 682 F. Supp. at 21. Safe Flight posited that its president was "'uniquely qualified' to assess the documents," *id.*, much as Hitkansut argues here. The defendant objected on the basis that the president was at the helm of a company with which it was in direct competition, and that the information could be abused to the competitive detriment of the defendant. *Id.* The court refused to allow Safe Flight's president access to the information at issue, applying a line of judicial precedent that approved of protective orders restricting disclosure of technical information only to the receiving party's trial attorneys and independent experts assisting them. *Id.* at 22 (providing an overview of cases that had approved of such agreements). The *Safe Flight* court noted that the plaintiff company's president was a competitor in defendant's market, and "question[ed] his human ability during future years of research to separate the applications he has extrapolated from [defendant's] documents from those he develops from his own ideas." *Id.* It discounted Safe Flight's alleged need for its president to examine technical information, suggesting that the plaintiff "investigate the availability of qualified outside experts" or "nominate a non-technical officer to make such a business calculation [regarding the economic merits of the litigation] in light of his[ or ]her review of the confidential documents, rather than an officer who is also a working scientist of the corporation." *Id.*

Other courts have entered similar orders based on the rationale espoused in *Safe Flight*. *See, e.g., Northbrook Digital, LLC v. Vendio Servs., Inc.*, 625 F. Supp. 2d 728, 735, 743 (D. Minn. 2008) (determining that a company's owner, who was also an attorney, could not have

access to proprietary information under the protective order because his "activities [related to] prosecuting continuation applications related to the patents in suit [were] not compatible with allowing him to review, either as an attorney or as an expert witness, [defendant's] confidential technical information"); *Tailored Lighting, Inc. v. Osram Sylvania Prods., Inc.*, 236 F.R.D. 146, 149 (W.D.N.Y. 2006) (concluding that a company's president should not have access to certain confidential information provided by defendant, an opposing patent holder, in part because it would be "unreasonable to expect that anyone working to further his own scientific and technological interests would be able assuredly to avoid even the subconscious use of confidential information revealed through discovery that is relevant to those interests"); *cf. Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373-GV, 2002 WL 33003691, at *3-4 (W.D. Tenn. Jan. 30, 2002) (distinguishing *Safe Flight* and allowing defendant inventor to examine confidential technical information because he did not initiate the lawsuit and should be allowed to defend himself, he had previously served as an expert witness for plaintiff and had access to its other confidential information, and he was not in direct competition with plaintiff).

These past analyses are instructive as this court balances Hitkansut's claim that Ms. Walker must have access to the government's confidential information to enable plaintiff to conduct a proper infringement analysis, Pls.' Mot. at 11, against the government's claim that a grant of such access would harm the business interests of CRADA partners and the ability of government laboratories to form partnerships with private companies for the purpose of technology transfer, *see* Def.'s Opp'n at 23-25. Ms. Walker owns a consulting business that is built around her knowledge of the processes at issue in this patent litigation. *See* Hr'g Tr. 49:4-7. Knowledge of Oak Ridge's confidential technical information could give Ms. Walker and her customers a competitive advantage in the field. Hitkansut argues that Ms. Walker would be required to keep Oak Ridge's information confidential, thus ameliorating any threat of competitive harm to Oak Ridge or its CRADA partners. *See* Hr'g Tr. 50:14-20. As in *Safe Flight*, adhering to such a promise presumably would require Ms. Walker to compartmentalize confidential information from her future thought processes. Even accepting that Ms. Walker would make a conscious and sustained effort to comply with the terms of the protective order, the fallibility of the human brain is paramount. It is simply impossible for a human being to segregate, or "unlearn," certain pieces of knowledge. Furthermore, Hitkansut has not made a sufficient showing of need in connection with its request for access by Ms. Walker. It concedes that independent experts exist who would be capable of understanding "the ultimate issues" and Ms. Walker's specialized work. Hr'g Tr. 48:6-25. Although the hiring of such an expert may add to litigation costs, Hitkansut initiated this lawsuit and must bear the usual costs of infringement litigation. In short, the harm to the government and its partners outweighs plaintiffs' need for a grant of access to Ms. Walker. Accordingly, the terms of the protective order will not permit Ms. Walker to review proprietary technical information provided by the government in this case. The parties should confer and provide the court with a stipulated protective order in light of this decision.

## CONCLUSION

Plaintiffs' motion to compel and for entry of a protective order is GRANTED IN PART and DENIED IN PART. It is granted insofar as the government is required to provide access to CRADA agreements, with redaction of confidential technical information and market projections

11

supplied by or belonging to the private partners, but with no redaction of the amounts of payments by the private partners to the government.  The government shall also supply plaintiffs with a privilege log covering information not disclosed pursuant to the privilege based upon 15 U.S.C. § 3710a(c)(7)(A) or any other privilege or protection that might be applicable.  Plaintiffs' motion is denied insofar as privileged information under Subparagraph 3710a(c)(7)(A) is concerned.  It is also denied insofar as plaintiffs seek to enable Ms. Walker to have access to confidential technical information.  The court orders the parties to confer and provide the court with a stipulated protective order within 20 days of entry of this opinion and order.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge