# In the United States Court of Federal Claims

No. 12-303C

(Filed Under Seal: July 25, 2013)
(Reissued: July 31, 2013)

| | | |
|---|---|---|
| ********************************** | ) | Patent case; claim construction for United |
| | ) | States Patent No. 7,175,722 |
| **HITKANSUT LLC, a Michigan** | ) | |
| **corporation, & ACCELEDYNE** | ) | |
| **TECHNOLOGIES, LTD., LLC, a** | ) | |
| **Michigan corporation,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| ********************************** | | |

John S. Artz, Dickinson Wright, PLLC, Troy, Michigan, for plaintiffs. With him on the briefs were J. Bradley Luchsinger, John A. Artz, and Bryan J. Schomer, Dickinson Wright, PLLC, Troy, Michigan.

Gary L. Hausken, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Acting Assistant Attorney General, and John Fargo, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

In this patent case, plaintiffs Hitkansut LLC and Acceledyne Technologies, Ltd., LLC (collectively, "Hitkansut") allege that the United States, through Oak Ridge National Laboratory

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information. No redactions were requested.

("Oak Ridge" or "the government"), has infringed upon claims 1, 2, 6, 7, 8, 11, and 14 of its patent for a materials processing method, U.S. Patent No. 7,175,722 ("the '722 patent"), and thus is liable for damages under 28 U.S.C. § 1498(a). Compl. ¶¶ 1, 10; Pls.' Opening Claim Construction Br. ("Pls.' Br.") at 5.[2]

## BACKGROUND

The invention at issue is a materials processing method allegedly being used by Oak Ridge and its private commercial research and development partners, and which plaintiffs claim infringes the process set forth in their '722 patent. Compl. ¶¶ 35-42; *see also Hitkansut LLC v. United States*, 111 Fed. Cl. 228 (2013) (resolving a discovery dispute over production of information related to or derived from cooperative research and development agreements between Oak Ridge and private partners). Hitkansut avers that its principal, Ms. Donna Walker, invented and patented a "materials processing method where multiple energy types are concurrently applied to the manufactured material to achieve property changes in an accelerated fashion." Pls.' Br. at 3. It claims that "[b]y decreasing the time required to process materials, or alternatively by decreasing the temperature of the process, Ms. Walker's method realizes a valuable reduction in the time and overall energy consumption of materials processing operations." *Id.*

On August 16, 2002, Ms. Walker filed a provisional application to patent this materials processing method, and the consequent application to be published was filed on July 31, 2003. Pls.' Br., Ex. A ("'722 patent") at 2. She was granted a patent on February 13, 2007. *Id.* The patent consists of fourteen claims, seven of which are the subject of this action. Of those seven claims, four are independent claims. *See id.* at 20-21.[3] Claim 1, the first independent claim, describes:

> A method of changing a physical property of a structure, comprising:
> providing a first energy to a structure by performing a first energy process according to an operational setting, at least one of the operational setting and a time value being selected according to a first order rate

---

[2]Subsection 1498(a) of Title 28 provides in pertinent part:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a).

[3]The independent claims at issue are Claims 1, 7, 11, and 14, and the dependent claims are Claims 2, 6, and 8.

relationship for the first energy process, according to a first order rate relationship for a second energy process, and according to a desired physical property value; and

providing a second energy to the structure by performing the second energy process;

wherein the first and second energy processes are performed concurrently for at least the time value;

wherein the first order rate relationship for the first energy process relates application of the first energy to the structure and a physical property of the structure;

wherein the first order rate relationship for the second energy process relates application of the second energy to the structure and the physical property;

wherein the first and second energies are different;

wherein the total energy provided to the structure by the first and second energy processes is above an activation energy for the material of the structure;

wherein the first energy is thermal and wherein the second energy is oscillatory;

wherein the operational setting is a temperature setting, wherein one of the temperature setting and the time value is selected according to the first order rate relationship for the first energy process, according to the first order rate relationship for the second energy process, according to desired physical property value, and according to the other one of the temperature setting and the time value; and

wherein the first order rate relationship for the first energy process is a first Larson[-]Miller relationship that relates application of thermal energy to the structure and the physical property, and wherein the first order rate relationship for the second energy process is a second Larson[-]Miller relationship that relates application of oscillatory energy to the structure and the physical property.

'722 patent, Claim 1.

Claim 7, the second independent claim, describes:

A method of changing a physical property of a structure, comprising:

providing a first energy to a structure by performing a first energy process according to an operational setting, at least one of the operational setting and a time value being selected according to a first order rate relationship for the first energy process, according to a first order rate relationship for a second energy process, and according to a desired physical property value; and

providing a second energy to the structure by performing the second energy process;

wherein the first and second energy processes are performed concurrently for at least the time value;

wherein the first order rate relationship for the first energy process relates application of the first energy to the structure and a physical property of the structure;

wherein the first order rate relationship for the second energy process relates application of the second energy to the structure and the physical property;

wherein the first and second energy are different;

wherein the total energy provided to the structure by the first and second energy processes is above an activation energy for the material of the structure; and

wherein the first order rate relationship for the first energy process is a first Larson[-]Miller relationship that relates application of the first energy to the structure and the physical property, and wherein the first order rate relationship for the second energy process is a second Larson[-]Miller relationship that relates application of the second energy to the structure and the physical property.

'722 patent, Claim 7.

Claim 11, the third independent claim, provides:

A method of changing a physical property of a structure, comprising:

providing a first energy to a structure by performing a first energy process according to an operational setting;

providing a second energy to the structure by performing a second energy process;

wherein the first and second energy processes are performed concurrently to provide energy above an activation energy for the material of the structure for at least a time value;

wherein one of the operational setting and the time value are selected according to a desired physical property value and according to a first order rate relationship that relates concurrent application of the first and second energy to the structure and the physical property of the structure; and

further comprising determining the Larson[-]Miller relationship that relates concurrent application of the first and second energy to the structure and to the physical property of the structure.

'722 patent, Claim 11.

Claim 14, the final independent claim pertinent to this action,[4] describes:

A method of determining operational settings and time values for concurrent application of multiple energy forms to a structure to change a physical property of the structure, the method comprising:

---

[4]No allegation of infringement was made by plaintiffs regarding a further independent claim, Claim 12.

4

determining a first parameter according to a desired physical property value for the structure and according to a first order rate relationship for a first energy process that relates application of a first energy to the structure and the physical property;

determining a second parameter according the desired physical property value and according to a first order rate relationship for a second energy process that relates application of a second energy to the structure and the physical property;

selecting a first one of a time value and an operational setting for the first energy process; and

selecting a second one of the time value and the operational setting according to the first and second parameters, according to the first order rate relationship for the first energy process, and according to the first one of the time value and the operational setting;

wherein the first order rate relationship for the first energy process is a first Larson[-]Miller relationship that relates application of the first energy to the structure and the physical property, and wherein the first order rate relationship for the second energy process is a second Larson[-]Miller relationship that relates application of the second energy to the structure and the physical property.

'722 patent, Claim 14.

In 2002, Gerard Ludtka, a researcher at Oak Ridge, was working actively in the general field of the '722 patent, as, indeed, he still is so engaged. Hitkansut contends that Dr. Ludtka and Oak Ridge hosted Ms. Walker as a guest researcher from 2003 through 2005 and that they then held discussions about a collaborative research effort, during which Ms. Walker disclosed her inventive process to Oak Ridge employees. *See* Pls.' Br. at 4. No collaborative research agreement came to fruition. *Id.* Hitkansut alleges that Oak Ridge improperly used Ms. Walker's process as the basis for a patent, No. 7,161,124, the application for which was filed in April 2005 and which was granted on January 9, 2007. Compl. ¶¶ 22-25.[5] Hitkansut also alleges that Oak Ridge's later activities, including continued research with regard to "thermomagnetic processing," allegedly was funded in part by agreements with private parties who are beginning to use the process commercially. Compl. ¶¶ 27-45; *see also* Pls.' Br. at 5.

## PROCEDURAL HISTORY

Hitkansut filed suit in this court on May 10, 2012, alleging patent infringement. The parties submitted briefs on claim construction and presented arguments at a *Markman* hearing held on May 2, 2013. Of the twenty-one claim terms identified by parties, only two have an

---

[5]Earlier, on August 13, 2002, Dr. Ludtka had filed an application to patent a "method for residual stress relief and retained austenite destabilization." Pls.' Br., Ex. D. Patent No. 6,773,513 was granted in 2004 based upon that application. *Id.*

agreed-upon construction.  *See* Pls.' Br. at 11-12.[6]  For those two terms, the court accepts the mutually acceptable constructions proffered by the parties.  The constructions adopted by the court for the disputed terms of the '722 patent are set forth below.

## DISCUSSION

### A.  *Standards for Construction*

"The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).  The construction and meaning of claims in a patent are questions of law for the court to address.  *Markman*, 517 U.S. at 388-90.  The trial court is not required to construe every term in a patent, but it must construe any term for which claim scope is disputed.  *O2 Micro*, 521 F.3d at 1360-61; *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010).  The court should first look to the intrinsic evidence of record, as "intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Intrinsic evidence consists of the "patent itself, including the claims, the specification[,] and . . . the prosecution history."  *Id.* (citing *Markman*, 52 F.3d at 979).

To construe claim terms properly, a court should generally look to the ordinary and customary meanings attributed by those of ordinary skill in the art at the date of the invention, which is the effective filing date of the patent application.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art."  *Id.*  Courts have recognized, however, that "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."  *Vitronics*, 90 F.3d at 1582 (citing *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)); *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990), *cert. dismissed pursuant to Sup. Ct. R. 46*, 499 U.S. 955 (1991).  Therefore, a court must review the patent's specification "to determine whether [an] inventor has used any terms in a manner inconsistent with their ordinary meaning."  *Id.*  Prosecution history may also be examined, with its principal purpose being to exclude interpretations disclaimed during prosecution.  *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582-83.

---

[6]While the parties listed three agreed-upon terms in the Joint Claim Construction Statement (Mar. 4, 2013), ECF No. 161, and in their briefs, they revealed at the *Markman* hearing that the meaning of one of those terms is now disputed, *see* Hr'g Tr. 72:17 to 73:14 (May 2, 2013).

The date will be omitted from further citations to the transcript of the *Markman* hearing.

Extrinsic evidence, which includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," *Markman*, 52 F.3d at 980, is "less significant than the intrinsic record" in the construction process, *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).  It should be considered by the court only when intrinsic evidence cannot be used to resolve ambiguities in the claim language.  *Id*.

B.  *Specific Terms of the Claims Requiring Construction*

*Term 1: "Structure."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means a solid manufactured part. | Means any physical object that is capable of being changed by multiple energy processes applied concurrently; the work piece to which the claimed invention is applied. |

Term 1 appears in independent Claims 1, 7, 11, 12, and 14.  The court must adopt a construction of the term which encompasses all such uses.  *See Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.").

Both parties' proposed constructions are somewhat problematic.  Under the government's definition, "any solid material[,] whether formed or not," would constitute a structure.  Def.'s Principal Claim Constr. Br. ("Def.'s Br.") at 16, ECF No. 20.  This definition encompasses naturally occurring materials, such as rocks, putting it at odds with the ordinary meaning of the word "structure," which shares a Latin root meaning to build with the active verb "construct." The use of the term "structure" in the patent specification accordingly contemplates manufactured or constructed objects.  *See* '722 patent, col. 5, lines 17-20 ("The invention finds particular utility in association with stress relieving structures such as manufactured parts, assemblies of multiple parts, welds, or other structures.").  Additionally, the plaintiffs' proffered construction, although more on point than defendant's construction, fails to include a limit apparent throughout the specification — namely, that the claimed invention must be applied to the manufactured or constructed object being addressed.  *See*, *e.g.*, '722 patent, col. 1, lines 16-19.

For the reasons stated, the court adopts an amalgam of the parties' proffered definitions of Term 1: "structure" means **a physical object that has been constructed or manufactured and to which the claimed invention is applied**.

7

*Term 2: "Energy."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means a type of work or heat. | Means a specific source or sources of energy that can be applied to structure, such as thermal, microwave, solar, nuclear, etc. Further, as used in the claims, energy is not limited to any specific source in particular, but includes all sources. |

Term 2 appears in Claims 1, 7, 11, 12, and 14. Plaintiffs' proposed construction, "a type of work or heat," approaches the ordinary and customary meaning of energy, as understood by those of ordinary skill in the art. The addition of the words "or heat," however, is redundant, as heat is simply a form of energy. The government's definition is helpful insofar as it appropriately notes that, as used in the patent, "energy" is applied to affect a structure. Such a notation comports with the patent specification, which states that "[t]he first and second energy types may individually be any form of energy applied to a structure." '722 patent, col. 3, lines 10-11.[7] The government's list of energy sources, however, is cumbersome and unnecessary because the government's proposed claim construction itself postulates that "as used in the claims, energy is not limited to any specific source in particular, but includes all sources."

At the *Markman* hearing, the government contended that "energy" in the context of the patent necessarily had to refer to two different *types* of energy being applied concurrently. *See* Hr'g Tr. 20:9 to 21:2 ("[A]ll that we're trying to get to here is that in writing the patent, they talk about a first energy, a second energy, different — two energies being different."). This contention is not reflected in the government's proffered claim construction, but the court will nonetheless consider it.

The general "doctrine of claim differentiation 'create[s] a presumption that each claim in a patent has a different scope.'" *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (quoting *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)). Although the Federal Circuit has cautioned that "the claim differentiation tool works best in the relationship between independent and dependent claims," it has also noted that, when applied with respect to two independent claims, "claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006); *see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011). Within the '722 patent, independent Claim 1 specifically identifies that the first and second energies mentioned are "different" and are of different types, *i.e.*, the first is "thermal" and the second is "oscillatory." *See* '722 patent, Claim 1, col. 19, lines 43-67. Conversely, independent Claim 14 does not state that the first and second energies are different or of divergent types. *See* '722 patent, Claim 14, col. 22, lines 37-64. Reading a limitation requiring different types or sources of "energy" into that term would render

---

[7]Plaintiffs adopt this construction, *see* Hr'g Tr. 17:18-19 ("The specification says that energy is any form of energy that can be applied to the structure."), although they did not add this notation to their proffered interpretation.

8

superfluous the modifiers used in Claim 1, and the limitation will not be adopted. In short, the claims do require that at least two different energy processes be employed, but not that they always be of different types.

For the reasons above, the court adopts the following construction of Term 2: "energy" means **the capacity to do work by various means, here, specifically, the capacity or capability to act on a structure**.

*Term 3: "Energy process."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means a method of imparting a type of work or heat to the structure which is not normally present. | Means a process that can provide energy of a specific type and apply that energy or energy source to the structure. |

Term 3 appears in Claims 1, 7, 11, and 14. The reasoning outlined in the discussion of Term 2 is applicable here, and therefore the use of plaintiffs' proposed phrasing — "a method of imparting a type of work" — is appropriate. As discussed *supra*, the type of work must also be applied to a structure. The second aspect of plaintiffs' proposed construction, referring to a type of work "which is not normally present," could create confusion or ambiguity regarding what may be classified as "normal." Plaintiffs argue that this qualifying phrase is needed because a structure "sitting in ambient conditions is technically subject to several energies such as room temperature, light radiation, gravity, the earth's magnetic field, and the like." Pls.' Br. at 18. The court rejects this argument, because "impart" is itself an active verb carrying a connotation of affirmative transmission of its subject. Furthermore, the exclusion of certain ambient sources of energy is addressed in the construction of Term 12, *infra*.

The court draws upon plaintiffs' proffered construction to conclude that Term 3 means **a method of imparting a type of work to a structure**.

*Term 4: "Operational setting."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means an adjustable characteristic of the energy process other than time. | Means a generic term that encompasses any setting, other than time, that may be required to cause the energy process to impart energy to the structure. |

Term 4 appears in Claims 1, 7, 8, 9, 10, 11, 12, and 14. Once again, both parties' proffered constructions fall short in accurately capturing the meaning of the term. Plaintiffs' proposed construction does not accurately convey the interplay between an operational setting and the energy process, as described by the language of the claims themselves and the patent specification. *See, e.g.,* '722 patent, Claim 1, col. 19, lines 45-46 ("providing a first energy to a structure by performing a first energy process *according* to an operational setting") (emphasis added); *id.* at col. 3, line 53 to col. 4, line 8; *id.* at col. 7, lines 14-23. In particular, plaintiffs' use of the word "characteristic" does not evoke a setting that guides the energy process, as the specification connotes. '722 patent, col. 3, lines 53-56 ("[A] method is provided for determining operational settings for concurrent application of multiple energy types to a structure."). The

government is correct that the patentee, acting as her own lexicographer, has specially defined "operational setting," Def.'s Br. at 19 (citing *Vitronics*, 90 F.3d at 1582); however, the government's proposed construction based upon the usage of the term in the specification is vague and of limited assistance in understanding the scope of the claims.

Both parties' constructions correctly exclude time from the meaning of Term 4, because paired references to the "operational setting and a time value" appear throughout the patent. *See, e.g.,* '722 patent, Claim 1, col. 19, line 47; *id.* at Claim 7, col. 20, line 59; *see also id.* at Claim 8, col. 21, lines 27-28; *id.* at Claim 11, col. 21, line 57.

For the stated reasons, the court adopts the following construction for Term 4: "operational setting" means **a set point, other than time, that guides or governs the application of the energy process**.

*Term 5: "First order rate relationship."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
| --- | --- |
| Means Larson-Miller relationship. | Means a mathematical relationship between the application of an energy to a structure and the change in a response of the structure that varies with the value of one and only one variable, and where the rate of change in the variable is exponential such that a plot of the natural logarithm over time results in a straight line. |

Term 5 appears in Claims 1, 7, 11, and 14. Plaintiffs note that Claims 1, 7, and 14 use the term "first order rate relationship," and then quote claims that relate a first order rate relationship to a Larson-Miller relationship. *See* '722 patent, Claim 1, col. 20, lines 9-14 ("[W]herein the first order rate relationship for the first energy process is a first Larson[-]Miller relationship . . . and wherein the first order rate relationship for the second energy process is a second Larson[-]Miller relationship."); *id.* at Claim 7, col. 21, lines 11-15; *id.* at Claim 14, col. 22, lines 57-62.[8] Plaintiffs argue that these claims in effect equate "first order rate relationship" to a "Larson[-]Miller relationship." *See* Pls.' Br. at 25 ("This language serves to equate the claim term 'first order rate relationship' with the term 'Larson[-]Miller relationship' by expressly stating that the first order rate relationship *is* a Larson[-]Miller relationship.") (emphasis in original). Plaintiffs cite to *Griffin v. Bertina*, 285 F.3d 1029, 1034 (Fed. Cir. 2002), to support this proposition, arguing that the Federal Circuit in that instance held "that a 'wherein' clause of an independent

---

[8]The term "Larson-Miller relationship" stems from a seminal technical article by two researchers, Messrs. Larson and Miller, which article was cited in the '722 patent as prior art. *See* '722 patent at 2 (citing F.R. Larson and James Miller, *A Time-Temperature Relationship for Rupture and Creep Stresses,* Transactions of ASME, pp. 765-775 (July 1952) ("Larson & Miller, *Rupture & Creep Stresses*")). Larson and Miller were employed by General Electric Company and performed research on a number of metallic alloys for the purpose of addressing turbine blade life. *See* Larson & Miller, *Transactions of Rupture & Creep Stresses*, at 765.

claim was limiting because it signaled the patentee's intent to elaborate on the meaning of a previously recited claim term." Pls.' Br. at 25.

The circumstances of this patent are distinguishable from those of *Griffin*, however. In that case, the Federal Circuit held that the Patent Board had not erred when it determined that "wherein" clauses limited the scope of a claim "because they relate[d] back to and clarif[ied] what is required." *Griffin*, 285 F.3d at 1034. It did not hold that a "wherein" clause limited the meaning of another phrase used throughout the patent. Here, by contrast, the '722 patent uses the term "first order rate relationship" in independent Claim 11, in which no "wherein" clause is used to establish that the first order rate relationship is a Larson-Miller relationship. Thus, while the scope of Claims 1, 7, and 14 may be limited by the language of the pertinent "wherein" clauses, the meaning of Term 5 as a general matter is not cabined by such.

The government argues that Term 5 should be given its ordinary meaning, as understood by people with ordinary skill in the art. Def.'s Br. at 20; Hr'g Tr. 33:4-12. The court agrees with the government that a first order rate relationship is a well-known concept of mathematics used in scientific fields, and accordingly adopts the government's proffered construction with minor changes. Term 5, "first order rate relationship," means **a mathematical relationship between the application of an energy to a structure and the responsive change in the structure that varies with the value of one variable, and where the rate of change in the variable is exponential such that a plot of the natural logarithm over time results in a straight line**.

The latter aspect of this definition is valid in this particular instance even though it would not apply generally as a matter of mathematics. Here, the specification refers repeatedly to a first order rate relationship that is a variant of the Arrhenius equation as applied in physics rather than chemistry, *e.g.*, a Larson-Miller relationship. *See* '722 patent, col. 2, lines 55-57 (where the words "such as" are used to introduce the phrase "Arhennius[sic]-type first order rate equation"); *see also id.* at col. 5, line 66 to col. 6, line 5 ("The first order rate relationships . . . may be . . . any characterization or expression of a relationship between application of the corresponding energy type to the structure and a physical property of interest, for example, including but not limited to Larson-Miller relationships and/or equivalents thereof."); *id.* col. 6, lines 21-23 ("In one implementation of the invention, L[arson]-M[iller] equations may be derived by taking the log of the Arrhenius equation."). Although the words "such as" and "including but not limited to" would ordinarily denote examples and not limitations, in this instance plaintiffs also agree that the patent specification uniformly treats of a first order rate relationship that is a Larson-Miller relationship, *i.e.*, one "derived by taking the log of the Arrhenius equation." '722 patent, col. 6, lines 21-23. The specification bears out the parties' agreement.

*Term 6: "Desired physical property value."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means a result or change that is sought from subjecting the structure to processing. | Means a value representing the desired condition of a "physical property of interest" or the amount of change in the "physical property of interest" to be achieved through use of the process. |

11

Term 6 is found in Claims 1, 2, 6, 7, 8, 11, and 14. The salient aspect of the disagreement between Hitkansut and the government over the term's meaning is whether the term represents a "desire at the beginning that's selected to help [the patentee] choose at what level [the patentee] want[s] these energies to be applied to . . . achieve [a goal]," Hr'g Tr. 44:3-5, or whether it is a numeric value "that represents the amount of change or condition of the structure after treatment," Def.'s Br. at 24. Hitkansut asserts that the specification supports its proffered construction, because it describes the invention as a method for:

> changing a physical property of a structure, wherein the physical property can be creep rate, creep, strain, stress, residual stress, internal stress, aging, mixing, motion through a membrane, or any property, such as those that may be controlled according to an Arhennius[sic]-type first order rate equation. . . . In one example, the physical property may be internal stress, where the desired physical property value is one of a remaining internal stress value and an internal stress reduction value.

'722 patent, col. 2, lines 52-67. Subsequently in the specification, a recitation notes that the physical property value can be a value, such as a stress relief level. *Id.* at col. 8, lines 38-39 ("any desired physical property value (*e.g.*, stress relief level")). The plaintiffs thus argue that "desired physical property value" "encompasses a relative result that is sought by processing, such as a reduced amount of residual stress." Pls.' Br. at 28. When read in concert with the specification, the language of the claims also supports plaintiffs' proffered construction, because the claims indicate that the "desired physical property value" is one of the variables used to select an operational setting or a time value. *See e.g.,* '722 patent, Claim 1, col. 19, lines 45-51 ("providing a first energy to a structure by performing a first energy process according to an operational setting, at least one of the operational setting and a time value being selected according to a first order rate relationship for the first energy process, according to a first order rate relationship for the a second energy process, *and according to a desired physical property value*") (emphasis added).

For the reasons stated, the court adopts the plaintiffs' construction for Term 6, that "desired physical property value" means **a result or change in the physical condition of a structure that is sought from subjecting the structure to processing**.

*Term 7: "At least one of the operational setting and a time value being selected according to a first order rate relationship for the first energy process, according to a first order rate relationship for a second energy process, and according to a desired physical property value."*

12

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means choosing a characteristic of the energy process or the time value of the energy process with a first order rate relationship for the first energy process, a first order rate relationship for a second energy process, and a desired physical property value in mind to achieve a temporal acceleration in the desired physical property value. | Means choosing at least one of an operational setting or a time value by applying the first order rate relationship for the first energy process and the first order rate relationship for the second energy process to apply sufficient energy to achieve the desired physical property value. |

Term 7 appears in Claims 1 and 7. The dispute between the parties with regard to Term 7 is essentially whether the phrase "should be construed to include the goal of 'achiev[ing] a temporal acceleration in the physical property value.'" Def.'s Br. at 24 (alteration in original). The phrase "temporal acceleration in the desired physical property value" appears nowhere in the term; nor would it be inferred by a person with ordinary skill in the art. Therefore, the court declines to include the phrase in the construction of the term. The notion of a desired goal is encapsulated within the definition of Term 6, *supra*.

For the reasons stated above, and drawing upon the terms defined *supra*, the court adopts the following construction for Term 7: **choosing a set point or time value for a first order rate relationship for the first energy process and for a first order rate relationship for the second energy process, to achieve a desired physical property value**.

*Term 8: "Performed concurrently for at least the/a time value."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means the presence of the energies in the structure during the time value. | Ordinary meaning: the two energy processes must be performed simultaneously for a time period that is predetermined. |

Term 8 appears in Claims 1 and 7. The representative language is illustrated by Claim 1, which states "wherein the first and second energy processes are performed concurrently for at least the time value." '722 patent, Claim 1, col. 19, lines 54-55. Plaintiffs argue that the term encompasses a phase when "the energies are within the part during the same period of time, whether the physical switch on the equipment is on or off." Hr'g Tr. 54:8-11. They support this position in their claim construction brief by noting that the term should include a situation where "the work piece is heated up to the appropriate temperature and then the heat source is turned off and the second energy is started," Pls.' Br. at 30, and assert that the specification contemplates this circumstance, *id.* (quoting '722 patent, col. 16, lines 51-57). Plaintiffs' interpretation of the relevant portion of the specification is misplaced. The pertinent portions of the specification state:

> [T]he thermal and oscillatory processes need not be exactly aligned in time, but need only be applied concurrently for the minimum time value . . . to achieve the desired amount of internal stress relief within the scope of the invention. . . . Other implementations of concurrent application of multiple energy types are contemplated within the scope of the invention. For example, either processes

13

(e.g., heat or vibration) may be started before the other one, or both may begin at the same time. Furthermore, either process may be continued after the other is discontinued or both may end at the same time.

'722 patent, col. 16, lines 32-37, lines 51-57. The statement that "either process may be continued after the other is discontinued" indicates that, at least at some point, both processes must be performed at the same time. It excludes a scenario where one process ends and a lull occurs, after which the second process begins. In effect, the specification confirms the ordinary usage of the word "concurrent."

Accordingly, the court adopts the following construction for Term 8: "performed concurrently for at least the/a time value" means **the two energy processes must be simultaneously applied for at least a portion of the processing period.**

*Term 9: "The total energy provided to the structure by the first and second energy processes."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means the total quantity of work or heat applied by the first and second energies. | Means the sum of the energy added to the structure as the result of applying the first energy process plus the energy added to the structure as the result of applying the second energy process. |

Term 9 appears in Claims 1 and 7. Both parties contend their proposed constructions reflect the common, ordinary meaning of the term. *See* Pls.' Br. at 32; Def.'s Br. at 26. They agree that their proposed constructions are not very different in substance, and that the meaning of the term hinges on the court's construction of Term 2, "energy." *See* Pls.' Br. at 32; Def.'s Br. at 26. The court has determined that Term 2 means "the capacity to do work by various means, here, specifically, the capacity or capability to act on a structure." *See supra* p. 8. The court need not substitute that definition for the word "energy" in Term 9, as plaintiffs urge. *See* Pls.' Br. at 32.

Accordingly, the court adopts the following meaning for Term 9: "the total energy provided to the structure by the first and second energy processes" means **the sum of the energy supplied to the structure via the application of the first and second energy processes, taken together**.

*Term 10: "Activation energy for the material."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means the energy required for initiating a change in a property of the structure. | Common meaning: the energy, in excess over the ground state, which must be added to an atomic or molecular system to allow a particular process to take place. |

Term 10 appears in claims 1, 7, and 11. The government asserts that its proffered construction gives the term "its ordinary meaning to those skilled in physical chemistry, physics and materials engineering" and should be used because the term is not defined in the

14

specification or prosecution history. Def.'s Br. at 26. Plaintiffs refute this, saying that the patentee "has made special use of [the] term [in the specification] to describe the energy required to initiate a change in a property in the structure." Pls.' Br. at 33. The specification supports plaintiffs' proffered definition. In discussing the first energy process, the specification notes that "processing equipment, such as thermal energy sources, may have upper limits on temperature, and/or it may be desired to maintain the structure at or below a safe temperature to avoid changing the structure temper or melting the structure, whereas a minimum temperature value would be a critical temperature for the material to exceed the activation energy therefor." '722 patent, col. 12, lines 9-15. The specification also uses "activation energy" in describing how internal or residual stress relief can be achieved by moving dislocations and reducing the overall dislocation density:

> The formation of a dislocation will result when the strain reaches a certain value equivalent to the *activation energy*. No dislocation interaction will occur unless it is energetically favorable to do so. . . . [E]nergy is added to the dislocations that results in exciting their motion. Since any system will move to the lower energy state, the dislocations will try to attain a lower energy configuration by combining or annihilating, thus reducing the internal stresses in the material.

*Id.* at col. 8, lines 47-58 (emphasis added). In short, the specification uses "activation energy" in a particular manner, as plaintiffs correctly assert, with reference to the energy needed to initiate a change in a property of the structure.

The court adopts plaintiffs' proffered construction of Term 10: "Activation energy for the material" means **the energy required for initiating a change in a property of the structure**.

*Term 11: "Oscillatory energy."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means pressure wave. | Means energy having frequency, amplitude and time as variables, including sound, mechanical vibration, and laser impulses. |

Term 11 appears in Claim 1. Plaintiffs contend that the patentee, acting as her own lexicographer, used the specification to define the term to mean "pressure wave." Pls.' Br. at 35-36. The government also argues that the patentee gave the term a special meaning, but a different one, consisting of its proffered definition invoking characteristics of an oscillation along with examples. *See* Def.'s Br. at 28.

Plaintiffs assert that the following passage from the specification supports their definition: "When energy, whether in the form of heat or any time-varying (e.g., oscillatory, periodic, pulsed) applied energy that can cause a pressure wave to be generated, is applied to a crystalline solid, energy is added to the dislocations that results in exciting their motion." '722 patent, col. 8, lines 50-55. While this sentence notes that oscillatory energy may produce a

15

pressure wave, it does not equate the two terms. Accordingly, plaintiffs' proposed definition cannot be accepted.

In support of its construction, the government does identify a portion of the specification that illuminates the meaning of Term 11, but its proffered interpretation also is unduly limiting. The relevant sentence of the specification states: "The oscillatory process, whether using sound, mechanical vibration, laser impulses, or some other oscillatory or time-varying applied energy process, is usually performed at a fixed temperature, where time, frequency, and amplitude are the variables." '722 patent, at col. 10, lines 41-46. The specification continues by noting that the frequency and amplitude settings can be determined by varied techniques, including "by identifying a resonant frequency for the structure and the system in which the structure is to be mounted during processing, and selecting a frequency at or near the resonant frequency." *Id.* at col. 10, lines 51-54. It also states that "specific frequency ranges for alloys can be predetermined for a specific method of frequency generation, whether sonic, laser, electrical, magnetic, mechanical, and microwave, or some other type." *Id.* at col. 11, lines 59-63. These references (sound, mechanical vibration, magnetic, microwave, and laser impulses) are to energy processes that can serve as methods of frequency generation, perhaps to achieve a resonant frequency, and perhaps not.

In short, there is no indication in the specification that the patentee deviated from use of the ordinary meaning of oscillatory — to move back and forth above and below a centering value. As such, the court adopts the following construction for Term 11: "oscillatory energy" means **energy that swings back and forth above and below a mean value**.

*Term 12: "Thermal energy."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
| --- | --- |
| Means heat that is not normally present. | Means the amount of energy expressed as temperature above absolute zero. |

Term 12 appears in Claim 1. Both parties agree that "thermal" refers to an energy expressed as temperature. *See* Pls.' Br. at 37; Def.'s Br. at 29. Defendant argues that its definition based upon thermal energy measured on the Kelvin or Rankine scales above absolute zero is supported because the equations used in the '722 patent use absolute temperature scales. Def.'s Br. at 29-30 (citing '722 patent, col. 7, lines 40-67). Plaintiffs, in turn, assert that the definition reflects the ordinary meaning of the term, because "[t]hose skilled in the art of heat treatment processes, and particularly heat treatment processes for metals, would understand the term 'thermal energy' to be energy in the form of heat that is added to a system." Pls.' Br. at 37. Plaintiffs also contend that the specification supports their proposed construction, and undercuts that of the defendant, because "the exemplary temperatures provided are all well above room temperature." *Id.* at 38-39 (citing '722 patent, col. 14, lines 50-65).

Plaintiffs' proffered construction is supported by the specification, which addresses thermal energy sources and then notes that "a section of a ship hull, aircraft structure, or bridge may be difficult to bring to a very high temperature, due to ambient conditions and/or heat sinking from attached structures." '722 patent, col. 12, lines 9-10, 15-18. This section illustrates

16

that when the patent references thermal energy, it contemplates an addition of heat to the ambient state of a structure.

Accordingly, the court adopts plaintiffs' construction of Term 12, with minor revisions: "thermal energy" means **heat that is not present at the ambient condition of the structure**.

*Term 13: "Parameter."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means Larson-Miller parameter. | Plain meaning: a quantity which is constant under a given set of conditions, but may be different under other conditions. |

Term 13 appears in dependent Claims 2, 3, 4, 5, 8, 9, 10, and 13, and independent Claims 12 and 14. Plaintiffs submit that the claim language specifically defines the term, and inextricably links "parameter" with a Larson-Miller relationship, a concept based on the Arrhenius rate equation, and discussed at Term 14, *infra*. *See* Pls.' Br. at 40. Claims 2 and 8 provide for "determining a first Larson[-]Miller parameter according [to] the first Larson[-]Miller relationship, the first Larson[-]Miller parameter corresponding to the desired physical property value; determining a second Larson[-]Miller parameter according to the second Larson[-]Miller relationship, the second Larson[-]Miller parameter corresponding to the desired physical property value." '722 patent, col. 20, lines 18-25; col. 21, lines 19-26. Claim 13 provides for "solving a first Larson[-]Miller equation for the second one of the temperature setting and the time value using the first one of the temperature setting . . . and the third Larson[-]Miller parameter." *Id.* at col. 22, lines 32-34. Claim 14, in turn, provides for "determining a first parameter according to a desired physical property value for the structure and according to a first order rate relationship for a first energy process, . . . determining a second parameter according [to] the desired physical property value and according to a first order rate relationship for a second energy process[,] . . . and selecting a second one of the time value and the operational setting according to the first and second parameters[,] . . . wherein the first order rate relationship for the first energy process is a first Larson[-]Miller relationship . . . and wherein the first order rate relationship for the second energy process is a second Larson[-]Miller relationship." *Id.* at col. 22, lines 41-62.

"[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. In this instance, the context in which "parameter" is used is dispositive. The claim language quoted *supra* makes evident that the patentee is referring to a depiction of the Larson-Miller relationship each time the term "parameter" is used. For that reason, the court adopts a modified version of plaintiffs' proffered construction of Term 13: "parameter" means **a point or points on the curve or equation that define the Larson-Miller relationship**, **or that are representative of empirical data from which such a curve or equation might be derived or approximated**.

*Term 14: "Larson-Miller relationship."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means a relationship between the physical state of the structure and the operational setting of the energy process. | *Means a first order rate relationship that is characterized by the following equation:* $P = \frac{\Delta H}{R} = T(C + \log t)$. |

Term 14 appears in Claims 1, 2, 3, 5, 7, 8, 9, 10, 11, 12, 13, and 14. The parties disagree over whether Term 14 requires reference to an equation. *Compare* Pls.' Br. at 41, *with* Def.'s Br. at 31. Plaintiffs argue that "reference to an equation is one way to utilize the Larson[-]Miller relationship" but that it can also "be utilized as a graphical expression or through experimentation." Pls.' Br. at 41 (internal citations omitted). The government argues that the patentee restricted the definition of Term 14 to "the first order rate equation commonly known as the 'Larson[-]Miller' equation" during the prosecution of the patent. Def.'s Br. at 32. It cites to a final office action issued on June 16, 2006, in which the patent examiner rejected all but two claims (then labeled as claims 20 and 21) and also noted that other claims (then-pending claims 4-9, 11-14, 19, and 24) were allowable "if rewritten in independent form including all of the limitations of the base claim and any intervening claims." *Id.* at App. 261 (Final Action (June 16, 2006)). The examiner stated that he allowed Claims 20 and 21 because "Exhibits D and E [of Ms. Walker's declaration filed on April 3, 2006] have shown that the combination of parameters determined by Larson-Miller and combined thermal and vibration process is critical and reduce[s] stress." *Id.* The patent applicant then rewrote Claims 4, 5, 11, 19, 20, and 24, and noted that there was "no intention of surrendering any range of equivalents to which [a]pplicant would otherwise be entitled in view of the prior art." *See id.* at App. 265-270, 272 (Response and Amendment (Sept. 15, 2006)). The applicant also stated that she "intend[ed] to file a continuation application to pursue the breadth of the claims as originally filed." *Id.* at App. 272. The government contends that these statements show that the applicant "explicitly acquiesced in the examiner's reasoning . . . [and] limited the scope of each of the claims to the use of the Larson[-]Miller parameter, $P = \frac{\Delta H}{R} = T(C + \log t)$." Def.'s Br. at 35. Thus, the government argues that any broader claim interpretation was disclaimed during prosecution, and consequently that the claims are now limited to the use of the Larson-Miller equation. Def.'s Br. at 35-36 (citing *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003) ("Statements made during prosecution which clearly disclaim a particular claim interpretation will limit the scope of the claims.")).

The government's interpretation ignores that parameters determined by a Larson-Miller relationship are not limited to those derived explicitly from an equation. Parameters may be determined based upon plots of experimental data, *i.e.*, in essence from experiments, the results of which define a part of the relationship empirically. That indeed was the approach taken by Larson and Miller in their seminal paper. *See supra* n.8. The patent specification confirms that this possibility is contemplated in, and encompassed by, the patent. *See* '722 patent, col. 6, lines 16-17, 23-26, 30-41.

The doctrine of claim differentiation also counsels against a narrow interpretation of Term 14. Under that doctrine, there is a presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim. *Curtiss-Wright Flow Control*

*Corp.*, 438 F.3d at 1380. In the '722 patent, Claim 13,[9] a dependent claim, modifies the scope of independent claim 12 and its use of "Larson-Miller relationship" by reciting "wherein the first Larson[-]Miller equation represents the first Larson[-]Miller relationship." '722 patent, col. 22, lines 35-36. Therefore, a presumption arises that Larson-Miller equation and Larson-Miller relationship have different meanings, such that Larson-Miller relationship is not limited to describing the mathematical expression $P = \frac{\Delta H}{R} = T(C + \log t)$.

Accordingly, the court adopts the following construction for Term 14: "Larson-Miller relationship" means **a parametric representation of a system of physical properties of a structure subjected to energy processes, which can take the form of the equation $P = \frac{\Delta H}{R} = T(C + \log t)$.**

*Term 15: "The Larson-Miller relationship that relates concurrent application of the first and second energy to the structure and the physical property of the structure."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Plain meaning. | Means a combined first order rate relationship that is defined by the Larson-Miller relationship that corresponds to the concurrent application of the first and second energies to the structure. |

Term 15 appears in Claim 11. The parties accept that the dispute over the meaning of Term 15 will be resolved by the court's constructions of Term 1, "structure," Term 2, "energy," Term 3, "energy processes," Term 8, "performed concurrently," and Term 14, "Larson-Miller relationship." *See* Pls.' Br. at 44; Def.'s Br. at 36.

Accordingly, the court determines that Term 15, "the Larson-Miller relationship that relates concurrent application of the first and second energy to the structure and the physical property of the structure," means **the Larson-Miller relationship that correlates the change in physical property of the structure to the concurrent application of the first and second energies to the structure**.

*Term 16: "Remaining internal stress value."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means amount of internal stress that is still present after processing. | Means a value representing the amount of internal stress that remains in the structure after the concurrent application of two or more energy processes. |

Term 16 appears in Claim 6. The crux of the parties' dispute is whether Term 16 represents a discrete numeric value or a relative amount of remaining internal stress. *Compare*

---

[9]Claim 13 is not asserted in this action; however, the language of the unasserted claims may still be useful in providing context to terms recited in the asserted claims. *See Phillips*, 415 F.3d at 1314.

Pls.' Br. at 45, *with* Def.'s Br. at 37. Plaintiffs submit that those with ordinary skill in the art of heat treatment processing would recognize that heat treatment processing is often performed to bring the remaining internal stress value in a structure as close to zero as possible, without an emphasis on the particular numeric value that is reached. *See* Pls.' Br. at 46. They also point to the language of the specification, which states that "the invention has been successfully implemented in reducing remaining internal (e.g., residual) stress in aluminum structures using concurrent application of thermal and oscillatory energy (e.g., mechanical vibration) to achieve a significant reduction in the time required to obtain a desired remaining internal stress value (e.g., or a desired amount of internal stress reduction)." '722 patent, col. 13, lines 50-57. This language indicates that a goal of the invention described in the '722 patent is to reduce the internal stress of a structure as much as practicably possible in an accelerated time period. The illustrations contained within the '722 patent also comport with plaintiffs' stance, because they show, through the use of points plotted on graphs, that the process desires to bring the remaining internal stress in a structure as close to a given numeric value as possible, but not necessarily to that exact value. *See* '722 patent, Sheets 5-6, Figs. 4A, 4B, 4D, and their accompanying descriptions, found at col. 4, lines 53-67. The court recognizes that a person with ordinary skill in the art would appreciate that it is difficult to quantify the internal stress that remains in a structure after processing, and that the specification contemplates this circumstance. Accordingly, it deems the government's proposed construction to be too limited.

For the above reasons, the court adopts plaintiffs' proffered construction of Term 16, with minor changes: "remaining internal stress value" means **the residual internal stress in a structure after processing has occurred**.

*Term 17: "Internal stress reduction value."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means amount of the reduction of the internal stress by the process. | Means a value representing the reduction in the amount of internal stress in the structure as a result of concurrently applying two or more energy processes to the structure. |

Term 17 appears in Claim 6. The parties' disagreement mirrors their conflict with respect to Term 16, *supra*. Again, the government submits that term must be associated with a specific numeric value, *see* Hr'g Tr. 77:21 to 78:2, while the plaintiffs counsel against a definition that incorporates numerical precision, and advocate for one that can represent a broader goal, Hr'g Tr. 80:5-17. For the reasons stated in the discussion following Term 16, *supra*, the court again endorses a construction broader than the one suggested by the government.

The court adopts the following meaning of Term 17: "internal stress reduction value" means **the degree of diminution in internal stress of a structure resulting from processing**.

*Term 18: "Multiple energy forms."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means at least a first energy and a second energy where the first and second energies are different. | Two or more forms of energy. |

20

Term 18 appears in Claim 14. The government's proffered construction contemplates the ordinary meaning of the term. *See* Hr'g Tr. 82:14-16. Plaintiffs argue that the term also contemplates that two of the energies described must be of different types. *See* Pls.' Br. at 48-49; Hr'g Tr. 8:13-20. They base their argument in part on the prosecution history, specifically on an Amendment dated April 4, 2006 which changed the term "multiple energy types" to "multiple energy forms," *see* Pls.' Br., Ex. F at 7, because the patent examiner objected to the use of the word "type" as being indefinite under 35 U.S.C. § 112, *id.* at 12. Plaintiffs assert that the salient aspect of the Amendment is a sentence stating that Claim 14 (then Claim 22) is "directed to determining operational settings and time values for concurrent application of *multiple energy types* to a structure, in which first and second parameters are determined according to first order rate relationships for *two different energy processes*." *Id.* at 16 (emphasis added). They argue that this language means that "multiple energy forms" encompasses the "two different energy processes" mentioned, which are the first energy process and the second energy process. Pls.' Br. at 49. Even setting aside the Federal Circuit's directive that the principal purpose of prosecution history is to exclude interpretations disclaimed during prosecution, *Chimie*, 402 F.3d at 1384, plaintiffs' strained reasoning does not reach so far. While the court appreciates that "multiple energy types" has a meaning very closely akin to "multiple energy forms," nothing in the rest of the cited prosecution history suggests that multiple energy forms must include first and second energies which are different in the sense used in Claim 1, *e.g.*, that one is thermal and the other is oscillatory.

For the reasons stated, the court adopts the government's proffered construction of Term 18: that "multiple energy forms" means **two or more forms of energy**.

*Term 19: "Larson-Miller parameter."*

| Plaintiffs' Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means a value determined from a Larson-Miller curve, a Larson-Miller equation, or other expressions or characterizations of the Larson-Miller relationship. | Means the value P determined by the following equation: $$P = \frac{\Delta H}{R} = T(C + \log t).$$ |

Term 19 appears in Claims 2, 3, 4, 5, 8, 9, 10, 12, and 13. Plaintiffs filed a supplemental brief on April 29, 2013, in which they advised that they were departing from the construction on which the parties had agreed in the Joint Claim Construction Statement. *See* Pls.' Supplemental Claim Construction Br. to Address a Further Disputed Claim Term at 1, ECF No. 32. The government continues to propose the formerly agreed construction. Questions have arisen regarding the timeliness of plaintiffs' submission. *See* Hr'g Tr. 73:1-12. The court finds it unnecessary to address those concerns, because Term 13, "parameter," and Term 19 in effect have corresponding meanings. *See supra* pp. 16-17.

Accordingly, the court determines that Term 19, "Larson-Miller parameter," means **a point or points on the curve or equation that define the Larson-Miller relationship**, **or empirical data from which such a curve or equation might be derived or approximated**.

C. *Terms of the Claims as to Which Construction Is Agreed*

*Term 20: "Selecting."*

Term 20 appears in Claims 2, 5, 8, 10, 12, 13, and 14. The parties agree that the term retains its **ordinary meaning**. Joint Claim Construction Statement at 3. The court accepts this mutually agreed construction.

*Term 21: "Internal stress."*

Term 21 appears in Claim 6 and 12. The parties agree that it retains its **ordinary meaning**. Joint Claim Construction Statement at 3. The court accepts this mutually agreed construction.

## CONCLUSION

No extrinsic evidence is necessary for resolution of claim construction. For the reasons detailed above, the twenty-one terms identified by the parties shall be construed as stated.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge